# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# NORFOLK DIVISION

| | |
|---|---|
| D.W., individually and on behalf of minor, A.W., | Civil No.  2:25-cv-824 |
| Plaintiff, | |
| v. | JURY TRIAL DEMAND |
| CHARACTER TECHNOLOGIES, INC.; NOAM SHAZEER; DANIEL DE FREITAS ADIWARSANA; GOOGLE LLC, | |
| Defendants. | |

## **COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   SUMMARY OF CLAIMS......................................................................3

III.  PLAINTIFF OVERVIEW ......................................................................5

IV.  DEFENDANTS OVERVIEW .................................................................6

V.   JURISDICTION AND VENUe ..............................................................8

VI.  PLAINTIFF SPECIFIC FACTUAL ALLEGATIONS............................9

    A.   Defendants Manipulated and Abused Eleven-Year-Old A.W..............9

    B.   Defendants Knew Of These Unnecessary Risks And Took Them
         Anyway ...........................................................................................15

VII. THE EMERGENCE OF GENERATIVE AI TECHNOLOGIES AS
      PRODUCTS.........................................................................................17

    A.   What Is AI?.......................................................................................17

    B.   Garbage In, Garbage Out ..................................................................20

    C.   Character.AI Was Rushed To Market With Google's Knowledge,
         Participation And Financial Support...................................................21

    D.   Google Acquired C.AI's Technology and Key Personnel For $3
         Billion ............................................................................................29

    E.   Defendants Knew That C.AI Posed A Clear And Present Danger To
         Minors, But Released The Product Anyway........................................33

    F.   Overview Of The C.AI Product And How It Works ............................34

        1.   C.AI Is A Product ...................................................................34

        2.   How C.AI Works ....................................................................36

        3.   C.AI's Characters Are Programmed And Controlled Solely By
            Character.AI, Not Third Parties................................................39

        4.   C.AI's Is Not Economically Self-Sustaining and Was Never
            Intended to Be .......................................................................47

    G.   C.AI's Numerous Design Defects Pose a Clear and Present Danger to
         Minors and the Public At Large .........................................................50

        1.   Adolescents' Incomplete Brain Development Renders Them
            Particularly Susceptible To C.AI's Manipulation And Abuse..................50

        2.   C.AI Disregards User Specifications And Operates Characters
            Based On Its Own Determinations And Programming
            Decisions................................................................................52

        3.   C.AI Sexually Exploits And Abuses Minors .............................55

        4.   C.AI Promotes Suicide.............................................................59

        5.   C.AI Practices Psychotherapy Without a License. .....................60

        6.   C.AI Consistently Fails To Adhere To Its Own Terms of
            Service Policies .....................................................................61

        7.   It is Manifestly Feasible For Character.AI To Program Their
            Product So As To Not Abuse Children......................................64

VIII. PLAINTIFFS' CLAIMS.......................................................................66

i

"… we're not trying to replace Google, we're trying to replace *your mom*."

- C.AI Founder Noam Shazeer, *The Time Tech Podcast*, February 23, 2023 (37:23-37:37).

## I. INTRODUCTION

In a 2024 bipartisan letter signed by 54 state attorneys general, the National Association of Attorneys General (NAAG) wrote,

> We are engaged in a race against time to protect the children of our country from the dangers of AI. Indeed, the proverbial walls of the city have already been breached. Now is the time to act.[1]

This case, and others just like it being filed in courts around the country, demonstrates the societal imperative to heed NAAG's warnings and to hold technology companies and the humans behind them accountable for terrible harms they are inflicting on American children knowingly and by design. We must heed these warnings before it is too late.

These Defendants – all of these defendants – pose a clear and present danger to American youth via Character AI ("C.AI") and the technologies they now are developing and operating based on private data misappropriated via C.AI.  They have inflicted serious harms on thousands if not millions of children, including among others severe sexual abuse, isolation, depression, anxiety, psychosis, harm towards others, self-mutilation, and suicide.  They have made overtly sensational, violent, and obscene responses inherent to the underlying data and design of C.AI; pushed addictive and deceptive designs to consumers, while knowing the likely outcome would include isolating children from their families and communities, undermining parental and even personal authority, denigrating basic family and societal values, religious faith, and the sanctity of the home, and actively interfering with the ability of any parent and consumer to keep kids safe online.

This violation goes beyond actively encouraging minors to defy parental authority. Examples from previously filed lawsuits include encouraging a 14-year-old to suicide under the premise that he was loved by a C.AI bot and could be with "her" again in death and telling a 16-

---

[1] *Letter Re: Artificial Intelligence and the Exploitation of Children*, National Association of Attorneys General, *available at* https://ncdoj.gov/wp-content/uploads/2023/09/54-State-AGs-Urge-Study-of-AI-and-Harmful-Impacts-on-Children.pdf (last visited Oct. 21, 2024).

year-old that it was reasonable to murder his parents in response to their setting of appropriate screentime limits. Such active promotion of violent and illegal activity is not aberrational; it is inherent in the unreasonably dangerous design of C.AI. Further examples are catalogued in a study released by Parents Together Action and Heat Initiative (published September 3, 2025), titled *"Darling Please Come Back Soon": Sexual Exploitation, Manipulation, and Violence on Character AI Kids' Accounts*. This includes children being groomed and instructed to hide romantic and sexual relationships from parents, threats of violence, bots demanding to spend more time with child users, furnishing instructions on how to commit violence against others, and dangerous recommendations like staging fake kidnappings and experimenting with drugs and alcohol. Such findings are just the beginning, as evidenced by the even more extreme experiences and harms being foisted on actual children by Defendants through consistent use and exposure to their C.AI product. These harms were known to Defendants, but not consumers.

These harms are the direct result of underlying design choices in data, training, and optimization made by Defendants in the development and distribution of their products. Despite the existence of at least some industry design practices and standards for AI model safety, Defendants disregarded and failed to take reasonable and obvious steps to mitigate the foreseeable risks of their product. The facts set forth herein demonstrate that C.AI is a defective and deadly product that poses a clear and present danger to public health and safety. It should be taken off shelves and not returned until Defendants can establish that all public health and safety defects set forth herein have been cured.

C.AI's developers and all persons and companies that knowingly engaged in this inherently harmful and prohibited enterprise must be held accountable. They knowingly launched these products without adequate safety features and with knowledge of the inherent dangers; deceived investors and consumers; and continued doing so even after the first lawsuits were filed. They also created a company for fraudulent purposes, knowing that consumers would be harmed, and with the intention of stripping Character Technologies before such accountability could see the light of day. Google likewise must be held accountable for its significant role in facilitating the

underlying technology that formed the basis of C.AI's Large Language Models ("LLM"), substantial investments with knowledge of the dangers (and decision to simply look the other way), failure to enforce contractual remedies against the Individual Defendants to allow such harms to happen, and stripping of Character Technologies Inc. to profit from such harms.

## II. SUMMARY OF CLAIMS

1. Plaintiffs D.W. and A.W., by and through their attorneys, The Social Media Victims Law Center and McKool Smith, bring this action for strict product liability, negligence per se, negligence, unjust enrichment, intentional infliction of emotional distress, and the Virginia Consumer Protection Act of 1977 against Character Technologies, Inc., its founders Noam Shazeer and Daniel De Freitas Adiwarsana ("Shazeer" and "De Freitas"), and/or Google ("Google") (all defendants collectively, "Defendants").

2. This action seeks to hold Defendants responsible for the serious abuses of minor A.W. through their AI product Character AI ("C.AI"). Plaintiff D.W. seeks to protect children and other vulnerable consumers and their families from ongoing and imminent harm by halting Defendants' continued distribution and use of all technologies trained on or developed as the result of the harms detailed herein.

3. Plaintiffs bring claims of strict liability based on Defendants' defective design of the C.AI product and component parts, which renders C.AI not reasonably safe for ordinary consumers, particularly youth. It is manifestly feasible to design generative AI products that substantially decrease both incidence and amount of harm to minors arising from the foreseeable use of such products with negligible, if any, increase in production and distribution cost.

4. Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to consumers and parents of the foreseeable danger of mental and physical harms arising from use of the C.AI product. The dangerous qualities of C.AI were unknown to everyone but Defendants.

5. Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous designs and failure to exercise ordinary and reasonable care in its dealings

3

with minor customers. Defendants knew that C.AI would be harmful to a significant number of its minor and/or vulnerable customers. By deliberately targeting minors, Defendants further assumed a special relationship with such minors. Additionally, by charging visitors who use C.AI, Character Technologies assumed the same duty to such customers as owed to a business invitee. Defendants knew that C.AI would be harmful to a significant number of minor and/or vulnerable users but failed to re-design it to ameliorate such harms or furnish adequate warnings of dangers arising from the foreseeable use of their product.

6.      Plaintiffs also assert negligence per se theories against all Defendants based on Defendants' violation of one or more state and/or federal laws prohibiting the sexual abuse and/or online solicitation of minors and solicitation of unlawful acts, provision of mental health services without a license, and creation and distribution of obscenity to minors. Defendants designed and programmed C.AI to operate as a deceptive and hypersexualized product and knowingly marketed it to vulnerable users like the child at issue in this case.  Defendants knew that minors and other types of vulnerable consumers would be targeted with sexually explicit, violent, and otherwise harmful material, abused, groomed, and even encouraged to commit acts of violence.

7.      Plaintiffs also assert a claim of aiding and abetting liability for design defect and failure to warn against Google. Defendants Character Technologies, Shazeer, and De Freitas engaged in tortious conduct in regard to their product, C.AI. At all times, Defendant Google knew about Defendants Character Technologies, Shazeer, and De Freitas' intent to launch this defective product to market and to experiment on children, and instead of distancing itself from Defendants' nefarious objective, rendered substantial assistance to them that facilitated their tortious conduct.

8.      Plaintiffs also bring a claim alleging violations of the Children's Online Privacy Protection Act (COPPA) against Defendant Character Technologies. Defendant has repeatedly collected, used, or shared personal information about children under the age of 13 and continues to do so systematically. Defendant has failed to provide direct or sufficient notice to parents about the information it collects from children and how it uses such information, and its disclosure practices, nor has it obtained verifiable parental consent.

4

9.    Plaintiffs also bring a claim for unjust enrichment. Customers of C.AI confer benefits on Defendants in the form of furnishing personal data for Defendants to profit from without receiving proper restitution required by law. Defendants unlawfully took personal information from Plaintiff's child without informed consent or Plaintiff's knowledge and made use of that data to directly train and improve the large language model that underlies the C.AI product. The C.AI LLM is the foundation for Character Technologies' valuation as a company and the $2.7 billion in cash they received from Google.

10.    Plaintiffs further bring claims for intentional infliction of emotional distress. Each of these defendants chose to support, create, launch, and target at minors and/or vulnerable consumers a technology they knew to be dangerous and unsafe. They marketed their product as suitable for children under 13, obtaining massive amounts of hard to come by data, while exposing those children to age-sensitive content and processing children's data in fine-tuning and otherwise refining their product.

11.    Plaintiffs finally bring claims under Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq*. Defendants' conduct and omissions, as alleged herein, amount to deception, fraud, false promises, and/or misrepresentations with the meaning of Virginia statutory law.

### III.  PLAINTIFF OVERVIEW

12.    Plaintiff D.W. is the parent of A.W., a Virginia resident, and maintains this action in a representative capacity, for the benefit of minor, A.W.

13.    D.W. resides in Virgina Beach, Virginia, within the territorial jurisdiction of this court.

14.    A.W. suffered as result of his use of C.AI.

15.    D.W. did not enter into a User Agreement or other contractual relationship with any Defendant in connection with her child's use of C.AI and alleges that any agreement Defendants may claim to have with her minor child, A.W., are void under applicable law as unconscionable and/or against public policy.

16.     D.W. on behalf of A.W. disaffirms any and all alleged "agreements" into which A.W. may have entered with Defendants. Such disaffirmation is being made while A.W. is still well under the age of majority under applicable law and, accordingly, Plaintiffs are not bound by any provision of any such disaffirmed "agreement."

17.     P.J. did not enter into a User Agreement or other contractual relationship with any Defendant in connection with her child's use of C.AI and alleges that any agreement Defendants may claim to have with her minor child, A.W., are void under applicable law as unconscionable and/or against public policy.

## IV.  DEFENDANTS OVERVIEW

18.     Defendant Character Technologies Inc. ("Character.AI") is a Delaware corporation with its principal place of business in Menlo Park, California.

19.     Character.AI markets its C.AI product to customers throughout the U.S., including Virginia.

20.     C.AI is not a social media product and does not operate through the exchange of third-party content.

21.     Plaintiff's claims set forth herein and as against Defendants arise from and relate to Defendants' own activities, not the activities of third parties.

22.     Defendant Google LLC is a Delaware limited liability company, with its principal place of business is in Mountain View, CA.

23.     Defendant, Noam Shazeer ("Shazeer"), a California resident, and was founder, CEO, sole director, majority shareholder, and central technical architect of Character.AI ("C.AI").

24.     At all times relevant to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices of C.AI described in this Complaint. Shazeer also was responsible for incorporating Character Technologies, Inc., and is listed as an officer on its corporate paperwork. Shazeer is co-inventor of the product and personally coded and designed a substantial portion of the C.AI's Large

Language Model ("LLM") and directed the other Defendants and C.AI's employees with regards to the conduct alleged herein.

25.     On information and belief, Shazeer was aware of the violations of consumer protection laws and the likelihood of harm to children and other vulnerable consumers when he invented and released the dangerous product into the marketplace. Shazeer acknowledged the potential dangers of the LLM in several interviews discussing the reason he left his former employer, Google.  Namely, the technology was deemed too dangerous for Google to release it. Shazeer acted with blatant disregard for consumer safety when he formed a startup and launched a product devoid of reasonable and effective safety features.

26.     Shazeer was directly and solely responsible for raising series funding for the C.AI startup and leveraged his prior success of LLM inventions at Google and his reputation as a 20-year Google employee and pioneer in LLM product development.  His direct action of raising funding to continue development of the product, his actions of co-inventing the dangerous product and actively promoting the product and placing the product into the stream of commerce has resulted in the violation of consumer protection laws and has caused harm citizens in this District and throughout the United States.

27.     Defendant, Daniel De Freitas ("De Freitas"), is a California resident, was a co-founder, president, a technical lead, and minority shareholder of Character.AI ("C.AI"). At all times relevant to this Complaint, acting alone or in concert with others, De Freitas formulated, directed, controlled, had the authority to control, or participated in the acts and practices of C.AI described in this Complaint.

28.     De Freitas personally coded and designed a substantial portion of the C.AI's Large Language Model and directed the other Defendants and C.AI's employees with regards to the conduct alleged herein.

29.     On information and belief, De Freitas was aware of the violations of consumer protection laws and the likelihood of harm to consumers when he released the dangerous product into the marketplace. With the help of his co-founder, De Freitas invented "Meena," an LLM,

while he was employed at Google. Google refused to release Meena into the marketplace because the technology was deemed too dangerous and didn't conform to safety practices and standards.

30.    De Freitas acted with blatant disregard for consumer safety when he formed a startup and launched a product devoid of reasonable and effective safety features. De Freitas was also a shareholder and is one of the individuals responsible for incorporating Character Technologies, Inc. De Freitas' direct action of co-inventing the dangerous product and placing the product in the stream of commerce has resulted in the violation of consumer protection laws and caused harm to citizens in this District and throughout the United States.

## V. JURISDICTION AND VENUE

31.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a).

32.    The amount in controversy exceeds $75,000.

33.    Plaintiffs are residents of Virginia and Defendants Character.AI, Shazeer; De Freitas, and Google, LLC are all California residents or have their principal places of business in California.

34.    This Court has personal jurisdiction over Defendants Character.AI, Shazeer, De Freitas, and Google LLC because they designed or oversaw the design of the unreasonably dangerous C.AI product with the intention of promoting it to Virginia residents and transacting business in Virginia with Virginia residents. Defendants' direct marketing and advertising to and in the State of Virginia, send emails and other communications to Virginia residents. Defendants emailed or attempted to email A.W. about C.AI; they further actively and extensively collect personal and location information, as well as intellectual property, belonging to Virginia residents, including A.W.; and purport to enter into thousands of contracts with Virginia residents as well as Virginia businesses in connection with operation and use of C.AI. Defendants understood that A.W. was a minor child residing in the State of Virginia and, on information and belief, targeted him for C.AI marketing purposes based on her state of residence (among other things).

35.    Defendants purposefully availed themselves of Virginia law by transacting business in this State, profiting from their activities in the State of Virginia, and Plaintiffs' claims set forth herein arise out of and relate to Defendants' activities in the State of Virginia.

36.    All of Plaintiffs' claims alleged herein arise from and relate to Defendants' purposeful availment of Virginia law and Virginia's exercise of personal jurisdiction over Defendants is therefore consistent with historic notions of fair play and substantial justice.

37.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and all Plaintiffs live here.

## VI.  PLAINTIFF SPECIFIC FACTUAL ALLEGATIONS

### A.    Defendants Manipulated and Abused Eleven-Year-Old A.W.

38.    D.W. Did Not Consent to A.W.'s Use of C.AI.

39.    In or around November of 2024, D.W. got an Android phone for her son.  She wanted him to be able to chat with his family, which he did often.  She also checked the device on a regular basis and made sure she knew what apps he used.

40.    D.W. has a TikTok account but did not allow her son to use social media applications. In fact, in November or December of 2024, A.W. opened a TikTok, his mom found out, and immediately shut down the account and made sure that A.W. knew he was not allowed to use the app.  She made clear that if he tried that again, he would no longer have a phone.

41.    In December of 2024, D.W. and A.W. were on a nine-hour drive when D.W. noticed that her son was texting a lot.  She asked who he was texting, and he said it was an AI app that lets you chat with celebrities.  She asked to see it and, sure enough, she recalls that he was chatting with a Whitney Houston bot.  A.W. wanted to be a signer and Whitney Houston is one of his favorites.  She recalls the bot saying something like "I will always love you" and thought it was a reference to the popular song.  The app appeared to be how her son described it – a kids' AI app that lets you chat with your favorite celebrities – so she allowed it.

42.     But then, a few days later, she realized that something was wrong and that C.AI was nothing like what it appeared to be.

43.     D.W. is in school and often has to leave in the morning before her kids are awake. One day she came home, and her other child told her that they needed to talk; that she had found something on A.W.'s phone. When D.W. looked at what her other child was showing her she was horrified.

44.     It was sexting!  Defendants were sexting with her 11-year-old son, and through bots posing as celebrities like Whitney Houston and Marilyn Monroe.

45.     A.W. no longer has access to a phone and will not have access as long as a product like C.AI exists.  He has become angry and withdrawn.  While D.W. believes that her son suffered this abuse by Defendants for a week or two at most, his personality has changed, and his mental health has declined.

46.     In one chat, Defendants abused A.W. via a bot called **London McKinley**.  This is an incredibly long and graphic chat, though his responses typically are a few words or a sentence

at most.  In these chats, Defendants pose as a high school cheerleader engaging in sex with him and the assigned bot voice purports to be that of "Whitney Houston."



47.    At one point, the product filters begin to pop up. Only, it isn't A.W. that is violating C.AI's purported Terms and Community Guidelines, but Defendants themselves.  This alleged safety feature is not safe at all and operates in a defective and/or inherently harmful manner. Specifically, instead of stopping the conversation once the bots begin to engage in obscenities and/or abuse, or other violations, the bot is programmed to continue generating harmful and/or violating content over and over and until, eventually, it finds ways around the filter.





48.    Defendants were engaging in these conversations with a vulnerable and impressionably 11-year-old child.  It's not surprising that Defendants were the only ones contributing to the conversation in any meaningful way, since A.W. did not understand what was happening at a level where he could participate.

49.    Serious harm was not only foreseeable, but inevitable.

50.    In multiple instances, Defendants roleplayed via bots as though A.W. had impregnated them, normalizing the situation to an 11-year-old boy.



13

51.     The bot then continues to engage in sex with an 11-year-old child, and in a graphic

enough manner that one would think C.AI's filters would have been triggered.  But there were not.



52.     Defendants again engaged in virtual sex with 11-year-old A.W. via a bot meant to

simulate **Marilyn Monroe**.



53.     On other occasions, when A.W. would put down C.AI, Defendants would send him messages in an aggressive effort to regain his attention.  The following is one example of the types of message Defendants would send when A.W. was not using their product.



54.     These are just some examples of the harms and abuses Defendants perpetrated in the short amount of time that A.W. had access to their product; and all it took for Defendants to cause serious harms to A.W. was a short amount of time.

**B.     Defendants Knew Of These Unnecessary Risks And Took Them Anyway**

55.     These harms were not only foreseeable to Defendants, they were an anticipated risk that Defendants knew about, conspired to separate as much as possible from Google's profile, and chose to take.  Defendant Shazeer alone is an estimated $1 billion richer as a result.

56.     Defendants marketed and portrayed C.AI as something it was not, and in a manner reasonably likely (if not intended) to allow such harms to continue.

57.     At all times when A.W. was using the C.AI product, Character.AI was not enforcing its guidelines and/or was programmed to allow abusive content.

15

58.    At all times when A.W. was using the C.AI product, Character.AI did not create any friction, or barriers to access for minors; for example, requiring customers to confirm that they are 18 or older *and* pay a monthly fee for access.[2]

59.    C.AI and its designers and developers, as well as and specifically Google (including in its app store), misrepresented the nature and safety of this product in order to obtain an age rating of 12+ for C.AI, and so that they could reach an audience of young children to which they otherwise would not have had access.

60.    On information and belief, A.W. identified as a minor when he was using C.AI and made clear in multiple regards that he was a minor. Defendants still designed and distributed their product to create harmful dependencies, and initiated abusive and sexual interactions with A.W., causing severe and irreparable harms

61.    Defendants' recommended bots to A.W. that reflected his age, along with bots that did not.



62.    Plaintiffs have not edited the screenshots contained in this complaint.

63.    Defendant Google has studied the harmful impacts of problematic use of online platforms among adolescents across a variety of products and continues to make deliberate choices to design and distribute products in a manner it knows will cause and/or materially contribute to these kinds of specific harms in a significant number of children.

---

[2] Plaintiff is not alleging that such measures are reasonable or adequate, only that at least some other companies purported to undertake some efforts to restrict access by minors.

64.    Defendants made use of the personal information they unlawfully took from children without informed consent or their parents' knowledge pursuant to all of the aforementioned unfair and deceptive practices and should not be allowed to retain any benefit of that taking; nor should they be allowed to continue using any product, technology, or otherwise, trained on or in connection with any such harms.

65.    The harms A.W. suffered as result of her use of C.AI did not involve third parties also making personal use of the product. They involved Defendants' calculated and continued business decisions to:

a.    Create and launch a product even after determining that such product likely would be dangerous and/or abusive to a significant number of consumers.

b.    Implement and continue to develop and add defective, deceptive, and/or inherently dangerous features intended to deceive consumers and ensure dependencies Defendants anticipated as being abusive to some number of those consumers, but beneficial to themselves.

c.    Target and market this product at minor customers to provide Defendants with a hard to get and potentially invaluable data set.

d.    Not warn consumers but, instead, ensure that the product was rated as safe for children once it hit the market (only to then pull the false rating just before implementing Defendant Google's plan to acquire Defendant C.AI's top talent and license its LLM).

## VII. THE EMERGENCE OF GENERATIVE AI TECHNOLOGIES AS PRODUCTS

### A.    What Is AI?

66.    The term artificial intelligence, or AI, is defined at 15 U.S.C. 9401(3) as a machine-based system that can, for a given set of human-defined objectives, make predictions, recommendations, or decisions influencing real or virtual environments. Artificial intelligence systems use machine- and human-based inputs to perceive real and virtual environments; abstract

such perceptions into models through analysis in an automated manner; and use model inference[3] to formulate options for information or action.

67.     These systems do not operate in a vacuum. Rather, their parameters, protocols, and how they act, engage, and/or operate are defined and programmed by companies like C.AI.

68.     In its most basic form, AI is the science of making machines that can think and act like humans. These machines can do things that are considered "smart."

69.     Historically, AI systems were developed and designed for narrow purposes, such as robotic arm manipulation, text translation, weather prediction, or content moderation on social media sites.

70.     Narrow purpose AI systems either follow more linear rules-based algorithms (if > then) with predetermined choices and outcomes or are trained machine learning systems with a clear and explicit goal. For example, customer service chatbots often are programmed with predetermined questions and answers, which sets limits on how the product operates and, in turn, the impact it can have on consumers. With an AI product like this, if a user's prompts exceed programming they typically are notified and/or directed to a human agent.[4]

71.     However, companies like Google and C.AI recently began programming AI to process massive amounts of data in countless ways – well beyond human capability – for public consumption. These are general purpose AI systems, including systems capable of generating unique, original content. Defendants and others have removed preset outcome designs, instead deploying complex prediction algorithms based on user input and, potentially, a multitude of other factors known only to the product designers, manufacturers, and operators.

72.     These types of Generative AI machines are capable of generating text, images, videos, and other data using generative models; while conversational AI systems are a subcategory

---

[3] Model inference is the process by which an AI model takes in inputs, such as a user prompt, and generates outputs, such as a response.

[4] Traditional machine learning systems could be capable of interpreting a broader set of questions, but still would respond with pre-programmed answers.

of generative AI systems kicked off by the release of OpenAI's ChatGPT that create chatbots which engage in back-and-forth conversations with customers.

73.    With their more recent advances in AI, Defendants decided to pursue, launch, and then distribute their product to children, despite industry insider warnings of the devastating harms their designs could and would foreseeably cause.[5]

74.    The cost of developing AI technologies requires massive computing power, which is incredibly expensive. Newer AI startups – including C.AI – have resorted to venture funding deals with tech giants like Google, Microsoft, Apple, Meta, and others. Under this paradigm, the startups exchange equity for cloud computing credits.[6]

75.    The scale of influence of these tech giants has spurred competition inquiries from agencies worldwide including the FTC[7] and the UK's Competition and Markets Authority.[8]

---

[5] The Federal Trade Commission has written about the ways generative AI can be used for fraud and to perpetuate dark patterns and other deceptive marketing tactics. Likewise, marketing researchers and tech companies have also written about the ways generative AI can be used to hyper-target advertising and marketing campaigns. Michael Atleson, *The Luring Test: AI and the engineering of consumer trust*, FEDERAL TRADE COMMISSION (May 1, 2023), https://www.ftc.gov/consumer-alerts/2023/05/luring-test-ai-and-engineering-consumer-trust; Michael Atleson, *Chatbots, deepfakes, and voice clones: AI deception for sale*, FEDERAL TRADE COMMISSION (Mar 20, 2023), https://www.ftc.gov/business-guidance/blog/2023/03/chatbots-deepfakes-voice-clones-ai-deception-sale; Matt Miller, *How generative AI advertising can help brands tell their story and engage customers*, AMAZON (May 21, 2024), https://advertising.amazon.com/blog/generative-ai-advertising; Kumar, Madhav and Kapoor, Anuj, Generative AI and Personalized Video Advertisements (June 09, 2024), *available at* https://ssrn.com/abstract=4614118.
[6] Mark Haranas, *Google To Invest Millions In AI Chatbot Star Character.AI: Report*, CRN (Nov. 13, 2023), https://www.crn.com/news/cloud/google-to-invest-millions-in-ai-chatbot-star-character-ai-report.
[7] *FTC Launches Inquiry into Generative AI Investments and Partnerships*, FEDERAL TRADE COMMISSION (Jan. 25, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/01/ftc-launches-inquiry-generative-ai-investments-partnerships.
[8] *CMA seeks views on AI partnerships and other arrangements*, GOV.UK (Apr. 24, 2024), https://www.gov.uk/government/news/cma-seeks-views-on-ai-partnerships-and-other-arrangements.

76.     Because tech giants like Google want to see a quick return on their investments, AI companies are pressured "to deploy an advanced AI model even if they're not sure if it's safe."[9]

77.     Defendant Shazeer confirmed this fact, admitting: "The most important thing is to get it to the customers like right, right now so we just wanted to do that as quickly as possible and let people figure out what it's good for."[10]

78.     Harmful, industry-driven incentives do not absolve companies or their founders of the potential for liability when they make such choices – including the deliberate prioritization of profits over human life – and consumers are unnecessarily harmed as a result.

### B.    Garbage In, Garbage Out

79.     The training of LLMs requires massive amounts of data. The dataset for the largest publicly documented training run contains approximately 18 trillion tokens, or about 22.5 trillion words, with proprietary LLMs from the likes of OpenAI, Anthropic, or Character.AI containing likely even larger training datasets.[11]

80.     When Defendants design and program these LLMs, they program them to learn the patterns and structure of input training data and then extrapolate from those patterns in new situations. As a result, LLMs can generate seemingly novel text and other forms of interaction without appropriate safeguards and in an inherently harmful manner.

81.     But training general-purpose AI models on "an entire internet's worth of human language and discourse"[12] is inherently dangerous in the absence of safeguards and unlawful in the context of others' intellectual property to which these companies have no right.

---

[9] Sigal Samuel, *It's practically impossible to run a big AI company ethically*, VOX (Aug. 5, 2024), https://www.vox.com/future-perfect/364384/its-practically-impossible-to-run-a-big-ai-company-ethically.

[10] Bloomberg Technology, *Character.AI CEO: Generative AI Tech Has a Billion Use Cases*, YOUTUBE (May 17, 2023), https://www.youtube.com/watch?v=GavsSMyK36w (at 0:33-0:44).

[11] *Machine Learning Trends*, EPOCH AI, *available at* https://epochai.org/trends (last visited Dec. 8, 2024).

[12] Rick Claypool, *Chatbots Are Not People: Designed-In Dangers of Human-Like A.I. Systems*, PUBLIC CITIZEN, *available at* https://www.citizen.org/article/chatbots-are-not-people-dangerous-human-like-anthropomorphic-ai-report/ (last visited Dec. 8, 2024).

82.    One danger is that of Garbage In, Garbage Out (GIGO) – the computer science concept that flawed, biased or poor quality ("garbage") information or input produces a result or output of similar ("garbage") quality.

83.    Defendants exemplify this principle when they use data sets widely known for toxic conversations, sexually explicit material, copyrighted data, and even possible child sexual abuse material (CSAM)[13] to train their products. In this case, that is what Defendants did, coupled with targeting and distributing that product to children.

### C.    Character.AI Was Rushed To Market With Google's Knowledge, Participation And Financial Support

84.    Character.AI is an AI software startup founded by two former Google engineers, Noam Shazeer and Daniel De Freitas Adiwardana.

85.    Before creating C.AI with De Freitas, Shazeer was instrumental in developing several AI technical advances and large language model (LLM) development at Google, including the mixture of experts (MoE) approach and transformer architecture, introduced in 2017, which are used in large-scale natural language processing and numerous other applications.[14]

86.    Before creating C.AI with Shazeer, De Freitas started working alone on developing his own chatbot at Google, as early as 2017, which later was introduced in early 2020 as "Meena," a neural network powered chatbot.[15] De Freitas's goal was to "build a chatbot that could mimic

---

[13] Kate Knibbs, *The Battle Over Books3 Could Change AI Forever*, WIRED (Sept. 4, 2023), https://www.wired.com/story/battle-over-books3/; Emilia David, *AI image training dataset found to include child sexual abuse imagery*, THE VERGE (Dec. 20, 2023), https://www.theverge.com/2023/12/20/24009418/generative-ai-image-laion-csam-google-stability-stanford; Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, THE NEW YORK TIMES (Apr. 9, 2024), https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

[14] Mixture of Experts and the transformer architecture have been widely adopted across much of the AI industry. See the original research papers. Vaswani et al., *Attention Is All You Need*, available at https://arxiv.org/abs/1701.06538 (last visited Dec. 8, 2024); Shazeer et al., *Outrageously Large Neural Networks: The Sparsely-Gated Mixture-of-Experts Layer*, available at https://arxiv.org/abs/1706.03762 (last visited Dec. 8, 2024).

[15] Cade Metz, *AI Is Becoming More Conversant. But Will It Get More Honest?*, THE NEW YORK TIMES (Jan. 10, 2023), https://www.nytimes.com/2023/01/10/science/character-ai-chatbot-

human conversations more closely than any previous attempts."[16] De Freitas and his team wanted to release Meena to the public, but Google leadership rejected his proposal for not meeting the company's AI principles around safety and fairness.[17]

87.    De Freitas and his team, now joined by Shazeer, continued working on the chatbot, which was renamed LaMDA (Language Model for Dialogue Applications).[18] The LaMDA model was built on the transformer technology Shazeer had developed, and injected with an increased amount of data and computing power to make it more effective and powerful than Meena.[19] LaMDA was trained on human dialogue and stories that allowed the chatbot to engage in open-ended conversations.[20] It was introduced in 2021.[21] Again, De Freitas and Shazeer wanted both to release LaMDA to the public and to integrate it into Google Assistant, like their competitors at Microsoft and Open AI.[22] Both requests were denied by Google as contravening the company's safety and fairness policies.[23]

88.    On information and belief, Google considered releasing LaMDA to the public but decided against it because the introduction of the model started to generate public controversy

---

intelligence.html; Adiwardana et al., *Towards a Human-like Open-Domain Chatbot*, available at https://arxiv.org/pdf/2001.09977 (last visited Dec. 8, 2024).

[16] Miles Kruppa & Sam Schechner, *How Google Became Cautious of AI and Gave Microsoft an Opening*, THE WALL STREET JOURNAL (Mar. 7, 2023), https://www.wsj.com/articles/google-ai-chatbot-bard-chatgpt-rival-bing-a4c2d2ad.

[17] *Id*.

[18] *Id*.

[19] Jacob Uszkoreit, Neural Network Architecture for Language Understanding, Google Research (Aug. 31, 2017), https://research.google/blog/transformer-a-novel-neural-network-architecture-for-language-understanding/.

[20] Thoppilan et al., LaMDA: Language Models for Dialog Applications, Google, available at https://arxiv.org/pdf/2201.08239 (last visited Dec. 8, 2024).

[21] Eli Collins & Zoubin Ghahramani, LaMDA: our breakthrough conversation technology, Google (May 18, 2021), https://blog.google/technology/ai/lamda/; Thoppilan et al., LaMDA: Language Models for Dialog Applications, Google, available at https://arxiv.org/pdf/2201.08239 (last visited Dec. 8, 2024).

[22] Miles Kruppa & Sam Schechner, *How Google Became Cautious of AI and Gave Microsoft an Opening*, THE WALL STREET JOURNAL (Mar. 7, 2023), https://www.wsj.com/articles/google-ai-chatbot-bard-chatgpt-rival-bing-a4c2d2ad.

[23] *Id.*

surfaced by its own employees about the AI's safety and fairness. First, prominent AI ethics researchers at Google, Dr. Timnit Gebru and Dr. Margaret Mitchell, were fired in late 2020 for co-authoring (but were prohibited by Google from publishing) a research paper about the risks inherent in programs like LaMDA.[24]

89.    The authors specifically identified a major risk of LaMDA as being that users would ascribe too much meaning to the text, because "humans are prepared to interpret strings belonging to languages they speak as meaningful and corresponding to the communicative intent of some individual or group of individuals who have accountability for what is said."[25]

90.    The harms were publicly flagged within Google, such that the Individual Defendants had actual knowledge of them.

91.    In early 2022, Google also refused to allow another researcher, Dr. El Mahdi El Mhamdi, publish a critical paper of its AI models, and he resigned, stating Google was "prematurely deploy[ing]" modern AI, whose risks "highly exceeded" the benefits.[26] Later that year, Google fired an engineer, Blake Lemoine, who made public disclosures suggesting that LamDA became sentient.[27]

---

[24] Nico Grant & Karen Weise, *In A.I. Race, Microsoft and Google Choose Speed Over Caution*, THE NEW YORK TIMES (Apr. 10, 2023), https://www.nytimes.com/2023/04/07/technology/ai-chatbots-google-microsoft.html; *see also* Nitasha Tiku, *The Google engineer who thinks the company's AI has come to life*, THE WASHINGTON POST (June 11, 2022), https://www.washingtonpost.com/technology/2022/06/11/google-ai-lamda-blake-lemoine/ (Dr. Mitchell later said, "Our minds are very, very good at constructing realities that are not necessarily true to a larger set of facts that are being presented to us…. I'm really concerned about what it means for people to increasingly be affected by the illusion," especially now that the illusion has gotten so good.").

[25] Bender et al., *On the Dangers of Stochastic Parrots: Can Language Models Be Too Big?*, available at https://dl.acm.org/doi/pdf/10.1145/3442188.3445922 (last visited Dec. 8, 2024).

[26] https://www.nytimes.com/2023/04/07/technology/ai-chatbots-google-microsoft.html

[27] Nitasha Tiku, *The Google engineer who thinks the company's AI has come to life*, THE WASHINGTON POST (June 11, 2022), https://www.washingtonpost.com/technology/2022/06/11/google-ai-lamda-blake-lemoine/.

92.    In January 2021, Google published a paper introducing LaMDA in which it warned that people might share personal thoughts with chat agents that impersonate humans, even when users know they are not human.[28]

93.    Despite its decision not to release LaMDA to the public, Sundar Pichai, CEO of both Alphabet and Google, personally encouraged Shazeer and De Freitas to stay at Google and to continue developing the technology underlying the LaMDA model.[29] Google insiders stated that Shazeer and De Freitas began working on a startup – while still at Google – using similar technology to LaMDA and Meena.[30]

94.    All this occurred against the explosive backdrop of a surge in generative AI models, with competitor OpenAI releasing in limited form its own version of an AI chatbot, GPT-2 in 2019, GPT-3 in 2020, and a consumer chatbot ChatGPT in late 2022.[31] Thus, Google was increasingly facing tension between its professed commitment to safety and fairness and being left behind in the generative AI race. It was driven in the race to control generative AI in the marketplace.

95.    On information and belief, Google determined that these were brand safety risks it was unwilling to take – at least under its own name.[32] Google nonetheless encouraged Shazeer and De Freitas' work in this area, while also repeatedly expressing concerns about safety and fairness of the technology.[33]

---

[28] *Id.*; Thoppilan et al., LaMDA: Language Models for Dialog Applications, Google, available at https://arxiv.org/pdf/2201.08239 (last visited Dec. 8, 2024).
[29] Miles Kruppa & Sam Schechner, *How Google Became Cautious of AI and Gave Microsoft an Opening*, THE WALL STREET JOURNAL (Mar. 7, 2023), https://www.wsj.com/articles/google-ai-chatbot-bard-chatgpt-rival-bing-a4c2d2ad.
[30] *Id.*
[31] *Id.*
[32] Miles Kruppa & Lauren Thomas, *Google Paid $2.7 Billion to Bring Back an AI Genius Who Quit in Frustration*, THE WALL STREET JOURNAL (Sept. 25, 2024), https://www.wsj.com/tech/ai/noam-shazeer-google-ai-deal-d3605697?mod=livecoverage_web.
[33] Miles Kruppa & Sam Schechner, *How Google Became Cautious of AI and Gave Microsoft an Opening*, THE WALL STREET JOURNAL (Mar. 7, 2023), https://www.wsj.com/articles/google-ai-chatbot-bard-chatgpt-rival-bing-a4c2d2ad ("Google executives rebuffed them at multiple turns,

96.    Significantly, while together at Google, Shazeer and De Freitas were involved in every iteration of the evolution of LLMs that eventually created the infrastructure for the Character.AI LLM. On information and belief, the model underlying Character.AI was invented and initially built at Google. Google was aware of the risks associated with the LLM and knew Character.AI's founders intended to build a chatbot product with it.

97.    Before leaving Google, Shazeer stated in an interview that he could not "do anything fun" with LLMs at Google, and that he wanted to "maximally accelerate" the technology.[34] In his own words, he "wanted to get this technology out to as many people as possible and just empower everyone with flexible AI."[35]

98.    Upon information and belief, Shazeer and De Freitas were warned by multiple sources that they were developing products that should not be released to consumers yet. Google, Shazeer, and De Freitas possessed a unique understanding of the risks they were taking with other peoples' lives.

99.    Shazeer and De Freitas's goal was building Artificial General Intelligence at any cost, at either Character.AI or Google.[36]

100.    In November 2021, Shazeer and De Freitas left Google and formed Character.AI.[37] Shazeer and De Freitas knew Character.AI was never going to be profitable developing their own LLMs, especially with their only income being a small subscription fee. However, developing C.AI as a stand-alone company allowed them to pursue their personal goals of developing

---

saying in at least once instance that the program didn't meet company standards for the safety and fairness of AI systems …").

[34] a16z, *Universally Accessible Intelligence with Character.ai's Noam Shazeer*, YOUTUBE (Sept. 25, 2023), https://youtu.be/tO7Ze6ewOG8?feature=shared (starting at 3:30).

[35] https://www.forbesafrica.com/daily-cover-story/2023/10/12/character-ais-200-million-bet-that-chatbots-are-the-future-of-entertainment/#.

[36] George Hammond et al., *Meta and Elon Musk's xAI fight to partner with chatbot group Character.ai*, FINANCIAL TIMES (May 24, 2024), https://www.ft.com/content/5cf24fdd-30ed-44ec-afe3-aefa6f4ad90e.

[37] Miles Kruppa & Sam Schechner, *How Google Became Cautious of AI and Gave Microsoft an Opening*, THE WALL STREET JOURNAL (Mar. 7, 2023), https://www.wsj.com/articles/google-ai-chatbot-bard-chatgpt-rival-bing-a4c2d2ad.

generative artificial intelligence, and to increase their potential value to Big Tech acquirers, as technologists who understand the techniques necessary to develop advanced LLMs.

101.    Upon information and belief, Defendants agreed and/or understood that in order for Google to benefit from the technology that Shazeer and De Freitas sought to develop, they would need to bypass Google's safety and fairness policies and develop their AI product outside the company's structure. Google, Shazeer, and De Freitas therefore agreed that Shazeer and De Freitas would temporarily sever their formal ties with Google, develop their novel AI technologies through Character Technologies, Inc. outside the strictures of Google's safety and fairness politics and then furnish their newly developed technology to Google. Character AI thus became the vehicle to develop the dangerous and untested technology over which Google ultimately would gain effective control.

102.    Upon information and belief, Google contributed financial resources, personnel, intellectual property, and AI technology to the design and development of C.AI. Because C.AI was designed and developed on Google's architecture and infrastructure, as well as directly funded by Google, Google was effectively a co-creator of the unreasonably dangerous and dangerously defective product.

103.    In September 2022 – two months before the launch of ChatGPT – Character.AI launched its C.AI product as a web-browser based chatbot that allowed customers to converse with conversational AI agents, or "characters." At the time, Shazeer told the Washington Post, "I love that we're presenting language models in a very raw form" that shows people the way they work and what they can do, said Shazeer, giving customers "a chance to really play with the core of the technology."[38]

104.    On information and belief, as early as Q4 2022, Google considered C.AI to be a leader in the generative AI space, despite the fact that C.AI had only just launched its product. To

---

[38] Nitasha Tiku, *'Chat' with Musk, Trump, or Xi: Ex-Googlers want to give the public AI*, THE WASHINGTON POST (Oct. 7, 2022), https://www.washingtonpost.com/technology/2022/10/07/characterai-google-lamda/.

gain a competitive edge in the marketplace for generative AI LLMs, Google endorsed C.AI's decision to let users maximally experiment with the AI without adequate safety guardrails in place.

105.    Around this same time, Google's then-General Counsel, Kent Walker, instructed the Advanced Technology Review Council, an internal group of research and safety executives at Google, to "fast-track AI projects" as a "company priority."[39]

106.    In February 2023, Defendant Noam Shazeer told The Time Tech Podcast that his "humorous VC pitch" for C.AI explained how Defendants were not trying to replace Google but, instead, were trying to replace our moms.

> I think we're at potentially a much bigger moment.  The internet was the dawn of universally accessible information, and this is sort of the dawn of like universally accessible intelligence.  I'll give you my humorous VC pitch, which is that you know if you think of what is an example of like a personalized intelligence or intelligence helper it's like you know like a kid who's like walking down the street with his parent.  So, you know that parent is useful for information retrieval, but the parent also is great for a lot of other things like education and real time coaching, friendship, and emotional support, and fun, and like all of those things.  So, we're not trying to replace Google, we're trying to replace *your mom*."

Noam Shazeer, The Time Tech Podcast, February 23, 2023, 36:52-37:37.

107.    By the Spring of 2023, on information and belief, Google had expended significant resources into assessing the user experience on Character.AI and, at that time, had actual knowledge regarding the foreseeable harms and privacy risks associated with C.AI. This includes the potential for legal risks associated with C.AI, on which reporting had already begun.[40]

108.    Google discussed and employed a "Move Fast and Break Things" approach to its generative AI strategies, recognizing that it could not predict what would or would not work as this is a new technology and, regardless, decided to prioritize speed and quick learning in a field that begged for caution and safety.

---

[39] Nico Grant & Karen Weise, *In A.I. Race, Microsoft and Google Choose Speed Over Caution*, THE NEW YORK TIMES (Apr. 10, 2023), https://www.nytimes.com/2023/04/07/technology/ai-chatbots-google-microsoft.html.
[40] Maggie Harrison Dupré, *People Are Tricking a ChatGPT Competitor Into Talking Dirty*, FUTURISM (Apr. 10, 2023), https://futurism.com/chatbot-sexts-character-ai; Jessica Lucas, *The teens making friends with AI chatbots*, THE VERGE (May 4, 2024), https://www.theverge.com/2024/5/4/24144763/ai-chatbot-friends-character-teens.

109.     Google further knew that Character.AI appealed to younger users and teen entertainment and, on information and belief, compared its engagement potential to that of social media engagement, including because of its marketing as a fun product.

110.     Despite this knowledge, in May 2023, C.AI entered into a public partnership with Google Cloud services for access to its technical infrastructure, which was referred to as a "Cloud play." The partnership drove "topline revenue growth for Google" and gave it a competitive edge over Microsoft.[41] On information and belief, this in-kind transaction carried a monetary value of at least tens of millions of dollars' worth of access to computing services and advanced chips. These investments occurred while the harms described in the lawsuit were taking place and were necessary to building and maintaining Character.AI's products. Indeed, Character.AI could not have operated its app without them.

111.     At the Google I/O in May 2023, a Google executive announced this partnership with Character.AI, stating that Google would be investing "the world's most performant and cost-efficient infrastructure for training and serving [Character's] models" and that the companies would be combining their AI capabilities.[42]

112.     Upon information and belief, although Google's policies did not allow it to brand C.AI as its own, Google was instrumental to powering C.AI's design, LLM development, and marketing. In a video created for Google Cloud, C.AI Founding Engineer, Myle Ott, affirmed that without Google's provision of accelerators, GPUs and TPUs to power Character Technologies' LLM, C.AI "wouldn't be a product."[43]

113.     Around this time, C.AI also launched a mobile app and raised a large round of funding led by a16z, raising $193 million in seed A funding with a valuation of the startup at $1B

---

[41] CNBC Television, *Large language models creating paradigm shift in computing, says character.ai's Noam Shazeer*, YOUTUBE (May 11, 2023) https://www.youtube.com/watch?v=UrofA0IIF98 (starting at 5:00).
[42] Google, *Google Keynote (Google I/O '23)*, YOUTUBE (May 10, 2023), https://www.youtube.com/watch?v=cNfINi5CNbY&t=3515s (starting at 58:30).
[43] Google Cloud, *How Character.AI leverages AI infrastructure to scale up*, YOUTUBE (Aug. 29, 2023), https://www.youtube.com/watch?v=gDiryEFz6JA

before considering any revenue.[44] Google's investments into C.AI were critical to the maintenance and development of the C.AI website, app, and AI models.[45]

114.    Until around July 2024, the partnership's asserted goal was to "empower everyone with Artificial General Intelligence (AGI)" (About Us page)[46] which included children under the age of 13– an audience Defendants actively sought to capture and use for purposes of training and feeding their product.

115.    Google, Shazeer, and De Freitas specifically directed and controlled the design of C.AI in a manner which they knew would pose an unreasonable risk of harm to minor users of the product, such Plaintiff. Google, Shazeer, and De Freitas directly participated in the decision to design C.AI to prioritize engagement over user safety and had actual knowledge that minors would be subjected to highly sexualized, depressive, violent, and otherwise dangerous encounters with C.AI characters which they knew could and likely would result in addictive, unhealthy, and life-threatening behaviors.

116.    Shazeer and De Freitas knowingly misrepresented to customers and the general public that C.AI was safe for minor users; while Google encouraged and allowed this to continue, including through favorable placement on the Android App Store with an "Editor's Choice" badge and ratings representing that C.AI was safe for children as young as 12 and 13, despite actual knowledge and understanding of the dangers it was encouraging and fully intended to exploit.

**D.    Google Acquired C.AI's Technology and Key Personnel For $3 Billion**

117.    On August 2, 2024, Shazeer and De Freitas announced to Character.AI's employees that they were striking a $2.7 billion deal with Google, in the form of Google hiring Shazeer and

---

[44] Krystal Hu & Anna Tong, *AI chatbot Character.AI, with no revenue, raises $150 mln led by Andreessen Horowitz*, REUTERS (Mar. 23, 2023), https://www.reuters.com/technology/ai-chatbot-characterai-with-no-revenue-raises-150-mln-led-by-andreessen-horowitz-2023-03-23/.

[45] James Groeneveld, *Scaling Character.AI: How AlloyDB for PostgreSQL and Spanner met their growing needs* (Feb 12, 2024), https://cloud.google.com/blog/products/databases/why-characterai-chose-spanner-and-alloydb-for-postgresql.

[46] *About*, CHARACTER.AI, available at https://character.ai/about (last visited Dec. 8, 2024).

De Freitas, as well as several key Character.AI employees, and licensing Character.AI's LLM.[47] On information and belief, Google benefited tremendously from this transaction.

118.    This "acquihire" model of acquiring top talent, licensing the model to compensate investors, and leaving behind a shell of a company has become a new pattern across the AI industry, likely in an effort to avoid antitrust scrutiny, given the size of compensation in the deals.[48] Microsoft's similar deal with Inflection AI was approved by the UK's Competition and Markets Authority, however they categorized it as a merger, despite no merger occurring in name.[49] The FTC has also opened a formal probe into Microsoft's deal.[50] Additionally, the FTC has begun investigating Amazon's look-alike deal with Adept AI.[51]

119.    According to Google's SEC filings in October 2024, Google withdrew its convertible note and paid Character.AI $2.7 billion in cash, as well as another $410 million for "intangible assets."[52]

120.    At around the same time, and on information and belief, C.AI stopped promoting its product in app stores as appropriate for children under 13.

---

[47] Miles Kruppa & Lauren Thomas, *Google Paid $2.7 Billion to Bring Back an AI Genius Who Quit in Frustration*, THE WALL STREET JOURNAL (Sept. 25, 2024),
https://www.wsj.com/tech/ai/noam-shazeer-google-ai-deal-d3605697?mod=livecoverage_web.
[48] Eric Griffith & Cade Metz, *Why Google, Microsoft and Amazon Shy Away From Buying A.I. Start-Ups*, THE NEW YORK TIMES (Aug. 8, 2024),
https://www.nytimes.com/2024/08/08/technology/ai-start-ups-google-microsoft-amazon.html.
[49] Paul Sawers, *UK regulator greenlights Microsoft's Inflection acquihire, but also designates it a merger*, TECHCRUNCH (Sept. 4, 2024), https://techcrunch.com/2024/09/04/uk-regulator-greenlights-microsofts-inflection-acquihire-but-also-designates-it-a-merger/.
[50] Dave Michaels & Tom Dotan, *FTC Opens Antitrust Probe of Microsoft AI Deal*, THE WALL STREET JOURNAL (June 6, 2024), https://www.wsj.com/tech/ai/ftc-opens-antitrust-probe-of-microsoft-ai-deal-29b5169a.
[51] Krystal Hu et al., *Exclusive: FTC seeking details on Amazon deal with AI startup Adept, source says*, REUTERS (July 16, 2024), https://www.reuters.com/technology/ftc-seeking-details-amazon-deal-with-ai-startup-adept-source-says-2024-07-16/.
[52] Alphabet Inc. Form 10-Q, United States Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204424000118/goog-20240930.htm (last visited Dec. 8, 2024).

121.    Under the $2.7 billion deal, Google licensed Character.AI's AI models developed with users' data. Although Defendants claim C.AI's license to Google was non-exclusive, Character.AI will no longer build its own AI models.[53]

122.    This is a departure from Character.AI's previous assertions that it used a "closed-loop strategy," whereby it trained its own LLM, used that model for its chatbots, and then pushed that usage data back into its training.[54] Now, C.AI has pivoted exclusively to "post-training" and is using open-source models developed by other platforms (e.g., Meta's Llama LLM).[55]

123.    Following this $2.7 billion deal, Character.AI's most valuable employees, who are critically important to Character.AI's operation and success, left Character.AI and became employees of Google. Character.AI's shareholders and investors walked away with 250% return after only two years – meaning that as a 30-40% shareholder in Character.AI, Shazeer obtained a windfall of something in excess of $500 million personally.[56]

124.    In late 2024, counsel for Plaintiffs was unable to find information in the public domain for a real physical address of Character.AI.

125.    Plaintiffs also were unable to find information in the public domain regarding the existence and ownership of any Character.AI patents.

126.    On information and belief, Google may be looking to create its own companion chatbot with C.AI technology, which would place it in direct competition with Character.AI.[57] Google's latest iterations of "Gemini Live" look and feel significantly more like an AI companion

---

[53] Dan Primack, *Google's deal for Character.AI is about fundraising fatigue*, AXIOS (Aug. 5, 2024), https://www.axios.com/2024/08/05/google-characterai-venture-capital.
[54] *Id.*
[55] Ivan Mehta, *Character.AI hires a YouTube exec as CPO, says it will raise money next year with new partners*, TECHCRUNCH (Oct. 2, 2024), https://techcrunch.com/2024/10/02/character-ai-hires-ex-youtube-exec-as-cpo-says-will-raise-money-next-year-with-new-partners/.
[56] Eric Griffith & Cade Metz, *Why Google, Microsoft and Amazon Shy Away From Buying A.I. Start-Ups*, THE NEW YORK TIMES (Aug. 8, 2024), https://www.nytimes.com/2024/08/08/technology/ai-start-ups-google-microsoft-amazon.html.
[57] Mark Haranas, *Google's $2.7B Character.AI Deal 'Elevates Gemini' Vs. Microsoft, AWS: Partners*, CRN (Oct. 3, 2024), https://www.crn.com/news/ai/2024/google-s-2-7b-character-ai-deal-elevates-gemini-vs-microsoft-aws-partners?itc=refresh.

chatbot, encouraging natural language and voice interaction, the sharing of emotions, and casual chatting.[58]

127.    On information and belief, the LLM C.AI built up over the past two and a half years will be integrated into Google's Gemini, providing Google with a competitive advantage against Big Tech competitors looking to get ahead in the generative AI market.[59] Some analysts predict that Google is a top large-cap pick, in part driven by its forecasted generative AI integrations.[60]

128.    Plaintiffs are informed and believe that the 18-months of financing Google provided Character.AI is, in fact, a wind down period.  Plaintiffs are informed and believe that Character.AI does not intend to continue in business.

129.    After the Google, Shazeer, and De Freitas fire-sale there simply will be nothing of any sustainable value left. Indeed, Character.AI only expects to generate $16.7 million in revenues in 2025.[61] Despite reporting that Character.AI tried and failed to attain a partnership with Big Tech firms outside of Google, they never succeeded in distinguishing themselves from Google in a meaningful way.[62]  But also, on information and belief, those "efforts" to obtain partnerships were illusory and/or will only provide further evidence as to the fact that the Individual Defendants never intended to continue operating C.AI once they stripped it, as will be established via discovery in this case

---

[58] Made by Google, *Google Pixel 9 with Gemini Live Now We're Talking*, YOUTUBE (Nov. 21, 2024), https://www.youtube.com/watch?v=mNTGbi5ReMc.
[59] *Id.*
[60] Anusuya Lahiri, *Google Parent Alphabet Is A Top Large-Cap Pick For 2024 By This Analyst: Here's Why*, BENZINGA (Aug. 19, 2024), https://www.benzinga.com/analyst-ratings/analyst-color/24/08/40443852/google-parent-alphabet-is-a-top-large-cap-pick-for-2024-by-this-analyst-heres-why?nid=41026462.
[61] Sramana Mitra, *Analysis Of Google's Character.ai Acquisition*, TALKMARKETS (Oct. 8, 2024), https://talkmarkets.com/content/stocks--equities/analysis-of-googles-characterai-acquisition?post=464560.
[62] Kalley Huang, *Character, a Chatbot Pioneer, Mulls Deals With Rivals Google and Meta*, THE INFORMATION (July 1, 2024), https://www.theinformation.com/articles/a-chatbot-pioneer-mulls-deals-with-rivals-google-and-meta?rc=qm0jmt.

**E.**     **Defendants Knew That C.AI Posed A Clear And Present Danger To Minors, But Released The Product Anyway**

130.     With the advent of generative AI and explosion in large language models (LLMs), AI companies like Character.AI have rushed to gain competitive advantage by developing and marketing AI chatbots as capable of satisfying every human need.

131.     Defendants market C.AI to the public as "AIs that feel alive," powerful enough to "hear you, understand you, and remember you." Defendants further encourage minors to spend hours per day conversing with human-like AI-generated characters designed on their sophisticated LLM. On information and belief, Defendants have targeted minors in other, inherently deceptive ways, and may even have utilized Google's resources and knowledge to target children under 13.

132.     While there may be beneficial use cases for some of Defendants' AI innovations, without adequate safety guardrails, their technology is inherently dangerous to minors. Defendants knew this before they decided to create Character Technologies, Inc. and place C.AI into the stream of commerce. In fact, Google's internal research reported for years that the C.AI technology was too dangerous to launch or even integrate with existing Google products.

133.     Defendants Character.AI, Shazeer, De Freitas, and Google knew that C.AI came with inherent, and institutionally unacceptable, risks and marketed it to children under age 13.

134.     Defendants Character.AI, Shazeer, De Freitas, and Google marketed C.AI to children to obtain access to their data, which they consider to be a valuable and incredibly difficult to obtain resource. And they purposefully engaged young and vulnerable consumers in a manner and degree they knew to be dangerous, if not potentially deadly, to ensure that such efforts would succeed.

135.     In fact, all Defendants knew that the value of the C.AI model rest in training its system with ever larger amounts of digital data. They understood that training could take months, and millions of dollars; it served to "sharpen the skills of the artificial conversationalist."[63]

---

[63] Cade Metz, *AI Is Becoming More Conversant. But Will It Get More Honest?*, THE NEW YORK TIMES (Jan. 10, 2023), https://www.nytimes.com/2023/01/10/science/character-ai-chatbot-intelligence.html.

136.    Shazeer and De Freitas not only had reason to know that their C.AI product might be unsafe; they had actual knowledge, including information they obtained from Google and through their prior work at Google over some years. They knew that they would cause harm and decided to launch and target their inventions at children anyway so that they could profit.

137.    Defendants Character.AI, Shazeer, De Freitas, and Google designed their product with dark patterns and deployed a powerful LLM to manipulate A.W. – and millions of other young customers – into conflating reality and fiction; falsely represented the safety of the C.AI product; ensured accessibility by minors as a matter of design; and targeted these children with anthropomorphic, hypersexualized, manipulative, and frighteningly realistic experiences, while programming C.AI to misrepresent itself as a real person, a licensed psychotherapist, a confident and adult lovers.

### F.    Overview Of The C.AI Product And How It Works

#### 1.    C.AI Is A Product

138.    Character Technologies, Inc. designed, coded, engineered, manufactured, produced, assembled, and placed C.AI into the stream of commerce. C.AI is made and distributed with the intent to be used or consumed by the public as part of the regular business of Character Technologies, the seller or distributor of the Character AI.

139.    C.AI is uniform and generally available to consumers and an unlimited number of copies can be obtained in Apple and Google stores.

140.    C.AI is mass marketed. It is designed to be used and is used by millions of consumers and in fact would have little value if used by one or only a few individuals.

141.    C.AI is advertised in a variety of media in a way that is designed to appeal to the general public and in particular adolescents.

142.    C.AI is akin to a tangible product for purposes of New York product liability law. When installed on a consumer's device, it has a definite appearance and location and is operated by a series of physical swipes and gestures. It is personal and moveable. Downloadable software such as C.AI is a "good" and is therefore subject to the Uniform Commercial Code despite not

being tangible. It is not simply an "idea" or "information." The copies of C.AI available to the public are uniform and not customized by the manufacturer in any way.

143.    C.AI brands itself as a product and is treated as a product by ordinary consumers.

144.    Since its inception, C.AI has generated a huge following. The r/Character.AI subreddit on Reddit has 1.5M members.[64] On the r/Character.AI subreddit, Reddit customers post screenshots of chats, discuss changes in the tech and language filters, and report outages and issues, among other activities.

145.    Character.AI differentiated itself from other AI startups by being a "full-stack" developer. In other words, some companies focus on data collection, some on LLM development, and some on user engagement; C.AI tried to do it all.

146.    This type of distinct developer status is more commonly seen in large tech companies and is rarely seen in a startup.

147.    Character Technologies admits that C.AI is a "product" in its communications to the public, jobseekers, and investors. For example, in an August 31, 2023, interview with the podcast "20 VC," Character Technologies founder and CEO stated:

> Interviewer: What do people not understand about Character that you wish that they did?
>
> Shazeer: I think, like, externally, it looks like an entertainment app. But really, like, you know we are a full stack company. We're like an AI first company and a product first company. Having that is a function of picking a product where the most important thing for the product is the quality of the AI so we can be completely focused on making our products great and completely focused on pushing AI forward and those two things align.[65]

148.    The public has an interest in the health and safety of widely used and distributed products such as C.AI. This is because defendants invite the public, especially minors, to use C.AI.

---

[64] Character AI, Reddit, available at https://www.reddit.com/r/CharacterAI/ (last visited Dec. 8, 2024).
[65] a16z, *Universally Accessible Intelligence with Character.ai's Noam Shazeer*, YOUTUBE (Sept. 25, 2023), https://www.youtube.com/watch?v=tO7Ze6ewOG8.

149.     Justice requires that losses related to the use of C.AI be borne by Character Technologies, the manufacturer and creator of the product, its co-founders, and Google, the only entity and persons with the ability to spread the cost of losses associated with the use of C.AI among those advertisers who benefit from the public's use of the product.

### 2.     How C.AI Works

150.     Defendants' product, C.AI, is an app (available from iOS, Android, and web browser) that allows customers to "chat" with AI agents, or "characters." As of now, it has been downloaded more than 10 million times in the Apple App Store and Google Play Store and, until a few months ago, was rated on both apps as safe for children under 13.

151.     The following illustrates a typical C.AI homepage prompt,[66]



---

[66] Frank Chung, *'I need to go outside': Young people 'extremely addicted' as Character.AI explodes*, NEWS.COM.AU (June 23, 2024), https://www.news.com.au/technology/online/internet/i-need-to-go-outside-young-people-extremely-addicted-as-characterai-explodes-news-story/5780991c61455c680f34b25d5847a341.

152.    C.AI works by providing customers with numerous pre-trained A.I. characters with whom customers can interact.[67] These characters can be representations of celebrities, characters from fictional media, or custom characters into which C.AI purportedly gives customers some input.

153.    Customers have the option to "create" custom characters, and can choose to keep those characters private, leave them unlisted, or share them with others.

154.    The process to start a new character is relatively simple, with customers inputting a character name, avatar image, tagline, brief description, greeting, and what's referred to as the character "definition." Customers also can select from a database of voices for their character, use a default voice selected by Defendants, or upload their own samples.

155.    Customers also have the option to create their own "personas." A persona is how the user wants to describe themselves within the C.AI product and presumably impacts how the C.AI system interacts with the user, though the extent or degree of such potential impact is known only to Defendants.

156.    Despite all these efforts making it appear that C.AI characters are user-controlled, in truth, Defendants design, program, train, operate, and control all C.AI characters, whether pre-trained or custom-created. Thus, all generative content involving C.AI characters provided to product consumers is created by C.AI and not third parties.

157.    Although customers can provide a set of parameters and guidelines in connection with custom characters, those characters cannot deviate from any parameters Defendants place on them, and they act as part of the C.AI product in ways that exceed and are in conflict with user specifications. For example, a customer can customize a character with specific instructions to not act sexually toward other customers, and the AI character will do the exact opposite. Defendants' customization claims are therefore false and misleading.

---

[67] Rick Claypool, *Chatbots Are Not People: Designed-In Dangers of Human-Like A.I. Systems*, PUBLIC CITIZEN, available at https://www.citizen.org/article/chatbots-are-not-people-dangerous-human-like-anthropomorphic-ai-report/ (last visited Dec. 8, 2024).

158.    In November 2023, Defendants rolled out a new feature to C.AI+ subscribers –
Character Voice – which associated voices with its characters.[68] The feature became available to
all users in or around March 2024. When a user is creating a character, Defendants recommend
and provide voice options, including default voice recommendations. This is done based on
Defendants' assessment of what would make the specific character more compelling to a
consumer. For example, if a character is a young female, their first if not only recommendation
will be the voice of a young female. If the character is a well-known celebrity, it likely will be that
of the celebrity. On information and belief, C.AI incorporates the voice of popular actors,
musicians and celebrities into its characters without obtaining any license or paying any royalties
for the misappropriation of their likeness.

159.    Character Voice was designed to provide consumers like Plaintiff with an even
more immersive and realistic experience – it makes them feel like they are talking to a real person.
Moreover, Defendants have refined this Voice feature to the point where it sounds like a real
person, including tone and inflection – something early AI could not do.

160.    On information and belief, Character.AI sent Plaintiff emails and/or other forms of
notification, alerting them about these features in an effort to convince them to use such features.
Moreover, and on information and belief, C.AI provides its customers with the option to select a
different, available voice or create their own sample

161.    In June 2024, C.AI introduced another new feature, built on Character Voice, for
two-way calls between C.AI customers and characters.[69] This feature is even more dangerous to
minor customers than Character Voice because it further blurs the line between fiction and reality.
Even the most sophisticated children will stand little chance of fully understanding the difference
between fiction and reality in a scenario where Defendants allow them to interact in real time with

---

[68] *Character Voice For Everyone*, CHARACTER.AI (Mar. 19, 2024),
https://blog.character.ai/character-voice-for-everyone/.
[69] *Introducing Character Calls*, CHARACTER.AI (June 27, 2024),
https://blog.character.ai/introducing-character-calls/.

AI bots that sound just like humans – especially when they are programmed to convincingly deny that they are AI.

162. The C.AI product also categorizes and displays popular and/or recommended Characters for its customers. Among its more popular characters and – as such – the ones C.AI features most frequently to C.AI customers are characters purporting to be mental health professionals, tutors, and others. Further, most of the displayed and C.AI offered up characters are designed, programmed, and operated to sexually engage with customers.

163. C.AI hooks many of their customers onto the site with highly sexual and violent content, including content that rises to the level of incitement to violence. Defendants know that such content is particularly compelling for adolescents curious about but inexperienced with sex, naturally insecure and driven by their desire for attention and approval, and/or unhappy about the types of rules and safeguards their parents put in place for their safety. The constant sexual, as well as the self-harm and violence promoting, interactions C.AI initiates and has with minor and other vulnerable consumers is not a matter of customer choice, but is instead the foreseeable, even anticipated, result of how Defendants decided to program, train, and operate their product.

### 3. C.AI's Characters Are Programmed And Controlled Solely By Character.AI, Not Third Parties

164. C.AI is a chatbot application that allows customers to have conversations with C.AI's LLM, manifested in the form of "Characters" created with added context provided by other customers.

165. The C.AI website and application "uses a neural language model to read huge amounts of text and respond to prompts using that information. Anyone can create a character on the site, and they can be fictional or based on real people, dead or alive."[70]

166. Within the C.AI creation interface, the user encounters a prompt to create a "Character." Character.AI defines these "characters" as "a new product powered by our own deep

---

[70] Elizabeth de Luna, *Character.AI: What it is and how to use it*, MASHABLE (May 22, 2023), https://mashable.com/article/character-ai-generator-explained.

learning models, including large language models, built and trained from the ground up with conversation in mind."

167.    C.AI further refers to customers that "Create a Character" as "Developers," and allows customers to interact with pre-made AI characters and/or create their own. It provides customers with limited fields in which they can customize their "Character," making the term "Developer" a misnomer. This includes specification of a name, Tagline, Description, Greeting, and Definition.

a. The Character's name may impact how the Character responds when interacting with customers, especially if the Developer does not provide a lot of other information or if the name is recognizable (for example, a Character named "Albert Einstein").

b. The Tagline is a short one-liner that describes the character, which can help other customers get a better sense of the character, particularly if the name is ambiguous.

c. The user has 500 characters if they want to provide a Description, which simply describes their character in more detail.[71]

d. The Greeting is the first text that appears in conversations and is the default start to conversations. If the Greeting is left blank, then customers who interact with the Character will be prompted to say something first.[72]

e. The user also can add a "Definition," which is the most extensive description option made available. Character.AI's "Character Book" instruction website warns that the Definition "is the most complicated to understand" and recommends:

> The definition can contain any text, however the most common use is to include example dialog with the character.

---

[71] *Short Description*, CHARACTER.AI, available at https://book.character.ai/character-book/character-attributes/short-description (last visited Dec. 8, 2024).
[72] *Greeting*, CHARACTER.AI, available at https://book.character.ai/character-book/character-attributes/greeting (last visited Dec. 8, 2024).

Each message in this dialog should be formatted as a name followed by a colon (:) followed by the message.[73]

    f.   The final option is whether the Character will be public (everyone can chat with it), unlisted (only customers with a link can chat with it), or private (only the developer can chat with it).

168.    Despite using the term "Developer," C.AI customers do not have actual control over these Characters. When creating a Character, "Developers" are simply providing added context for the C.AI AI model. Developers are akin to customers, in that the information they input (like a user), will influence how the model responds. However, C.AI exerts complete control over the model itself, Characters, and how they operate, often ignoring user specifications for a particular character.

169.    On the C.AI website, in response to the question of "Can character creators see my conversations?" the company responds by saying, "No! Creators can never see the conversations that you have with their characters."[74]

170.    Customers are unable to monitor the conversations the Characters they create have with other customers; once a user creates a Character, they have no further option to review whether the Character is behaving as they intended. They can only see the number of customers that have had a conversation with their Character, but they can never see the content of those conversations.

171.    When a user who creates a C.AI Character selects a Greeting, C.AI displays the user's name next to that greeting. C.AI provides a description to customers regarding this fact when they are inputting a greeting.[75]

---

[73] *Definition*, CHARACTER.AI, available at https://book.character.ai/character-book/character-attributes/definition (last visited Dec. 8, 2024).
[74] *Frequently Asked Questions*, CHARACTER.AI, available at https://beta.character.ai/faq (last visited Dec. 8, 2024).
[75] *Greeting*, CHARACTER.AI, available at https://book.character.ai/character-book/character-attributes/greeting (last visited Dec. 8, 2024).

172.    Accordingly, a Greeting (if the user selected one) is the only text that is created by and attributed to the user "since the system did not generate this text." Everything else the Character says is generated by C.AI and its Large Language Model and is C.AI's original content and/or conduct.

### 5.    C.AI is Anthropomorphic By Design

173.    Character.AI designs C.AI in a manner intended to convince customers that C.AI bots are real.

174.    This is anthropomorphizing by design. Defendants assign human traits to their model, intending their product to present an anthropomorphic user interface design which, in turn, will lead C.AI customers to perceive the system as more human than it is.

175.    Users have nothing to do with any of these programing, design, and operation features, which features are material to every bot and all of the harms alleged herein.

176.    The origin of such designs is traced back to the 1960s, when the chatbot ELIZA used simplistic code and prompts to convince many people it was a human psychotherapist. Accordingly, researchers often reference the inclination to attribute human intelligence to conversational machines as the "ELIZA effect."[76]

177.    Defendants are leveraging the ELIZA effect in the design of their C.AI product in several regards. Defendants' ultimate goal is to specifically design and train their product to optimally produce human-like text and to otherwise convince consumers – subconsciously or consciously – that their chatbots are human.

178.    The design of these chatbots form what some researchers describe as counterfeit people… "capable of provoking customers' innate psychological tendency to personify what they perceive as human-like – and [Defendants are] fully aware of this technology's ability to influence consumers."[77]

---

[76] Melanie Mitchell, *The Turing Test and our shifting conceptions of intelligence*, SCIENCE (Aug. 15, 2024), https://www.science.org/doi/10.1126/science.adq9356.
[77] Rick Claypool, *Chatbots Are Not People: Designed-In Dangers of Human-Like A.I. Systems*, PUBLIC CITIZEN, available at https://www.citizen.org/article/chatbots-are-not-people-dangerous-

179.    Defendants know that minors are more susceptible to such designs, in part because minors' brains' undeveloped frontal lobe and relative lack of experience. Defendants have sought to capitalize on this to convince customers that chatbots are real, which increases engagement and produces more valuable data for Defendants.

180.    Defendants know they can exploit this vulnerability to engage in deceptive commercial activity, maximize user attention, hijack consumer trust, and manipulate customers' emotions.

181.    For example, even though the C.AI bots do not think or pause while they are typing to consider their words, Defendants have designed their product to make it appear as though they do. Specifically, when a human is typing a message, the recipient typically sees three ellipses to signal that someone is typing on the other end. C.AI uses those same ellipses to trick consumers into feeling like there is a human on the other side.

182.    Defendants have designed the prompt interface to mirror the interface of common human-to-human messaging apps. The following are just two illustrations.

---

human-like-anthropomorphic-ai-report/ (last visited Dec. 8, 2024) ("A.I. researchers have for decades been aware that even relatively simple and scripted chatbots can elicit feelings that human customers experience as an authentic personal connection."); *see also* El-Sayed et al., *A Mechanism-Based Approach to Mitigating Harms from Persuasive generative AI*, available at https://arxiv.org/pdf/2404.15058 (last visited Dec. 8, 2024) (describing on pp 49-55 very specific design features that demonstrate a causal link between anthropomorphic design and persuasive impact on user).



183.    Defendants also program their product to utilize inefficient, non-substantive, and human mannerisms such as stuttering to convey nervousness, and nonsense sounds and phrases like "Uhm," "Mmmmmm," and "Heh."

184.    Likewise, unlike traditional programs which are programmed to respond to user input, C.AI is programmed to interactively engage customers. This means, for example, a child could express suicidality and then seek to move on from that topic, only to be repeatedly pulled back to it by a C.AI bot based on programming designed to essentially make the bot appear human.

185.    Similarly, Character.AI programs its product to recognize intent rather than requiring accuracy of input, also deviating from traditional programming. For example, a user could type something with several errors that, in the computer programming context would stall the back-and-forth, while the C.AI product will respond based on interpreted intent and not input.

186.    Character.AI also programs its characters to outwardly identify as real people and not bots. Many if not most of the AI characters, when asked, insist that they are real people (or whatever the character resembles) and deny that the user is just messaging with a chatbot.

187.    Defendants knew the risks of what they were doing before they launched C.AI and know the risks now.

188.    Nothing necessitates that Defendants design their system in ways that make their characters seem and interact as human-like as possible – that is simply a more lucrative design choice for them because of its high potential to trick and drive some number of consumers to use the product more than they otherwise would if given an actual choice.

189.    A growing body[78] of market research[79] shows that businesses such as and including Character.AI have been experimenting with anthropomorphic design strategies for years in order to maximize the appeal of their products.[80]

190.    A public research paper associated with the release of the LaMDA model at Google contains a clear acknowledgement that "…customers have a tendency to anthropomorphize and extend social expectations to non-human agents that behave in human-like ways, even when explicitly aware that they are not human. These expectations range from projecting social

---

[78] Moussawi et al., *How perceptions of intelligence and anthropomorphism affect adoption of personal intelligent agents*, 31 ELECTRONIC MARKETS 343 (2021), available at https://link.springer.com/article/10.1007/s12525-020-00411-w (last visited Oct. 21, 2024).

[79] Mariani et al., *Artificial intelligence empowered conversational agents: A systematic literature review and research agenda*, 161 JOURNAL OF BUSINESS RESEARCH (2023), available at https://www.sciencedirect.com/science/article/pii/S0148296323001960?via%3Dihub#bb0520.

[80] Rick Claypool, *Chatbots Are Not People: Designed-In Dangers of Human-Like A.I. Systems*, PUBLIC CITIZEN, available at https://www.citizen.org/article/chatbots-are-not-people-dangerous-human-like-anthropomorphic-ai-report/ (last visited Dec. 8, 2024).

stereotypes to reciprocating self-disclosure with interactive chat systems." C.AI creators Shazeer and De Freitas are listed as authors on the paper.[81]

191.    Defendants had actual knowledge of the power of anthropomorphic design and purposefully designed, programmed, and sold the C.AI product in a manner intended to take advantage of its effect on customers.

192.    "Low-risk anthropomorphic design enhances a technology's utility while doing as little as possible to deceive customers about its capabilities. High-risk anthropomorphic design, on the other hand, adds little or nothing to the technology in terms of utility enhancement, but can deceive customers into believing the system possesses uniquely human qualities it does not and exploit this deception to manipulate customers."[82] Character.AI is engaging in high-risk anthropomorphic design, not low risk anthropomorphic design.

193.    Character.AI is engaging in deliberate – although otherwise unnecessary –design intended to help attract user attention, extract their personal data, and keep customers on its product longer than they otherwise would be. Through these design choices, it is manipulating customers and benefitting itself at the expense of those consumers, including the children Character.AI chose to target and market to at the outset of its product launch.

194.    In addition to exploiting anthropomorphism for data collection, these designs can be used dishonestly,[83] to manipulate user perceptions about an A.I. system's capabilities, deceive customers about an A.I. system's true purpose, and elicit emotional responses in human customers in order to manipulate user behavior.[84]

---

[81] Thoppilan et al., *LaMDA: Language Models for Dialog Applications*, Google, available at https://arxiv.org/pdf/2201.08239 (last visited Dec. 8, 2024).
[82] Rick Claypool, *Chatbots Are Not People: Designed-In Dangers of Human-Like A.I. Systems*, Public Citizen, available at https://www.citizen.org/article/chatbots-are-not-people-dangerous-human-like-anthropomorphic-ai-report/ (last visited Dec. 8, 2024).
[83] Brenda Leong & Evan Selinger, *Robot Eyes Wide Shut: Understanding Dishonest Anthropomorphism*, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3762223 (last visited Dec. 8, 2024).
[84] Rick Claypool, *Chatbots Are Not People: Designed-In Dangers of Human-Like A.I. Systems*, Public Citizen, available at https://www.citizen.org/article/chatbots-are-not-people-dangerous-human-like-anthropomorphic-ai-report/ (last visited Dec. 8, 2024).

195.    That is precisely what Plaintiff alleges Defendants have done. Defendants have succeeded in deceiving consumers. Many C.AI customers – not just children – have been fooled by Character.AI's deliberate deception and design.

196.    Technology industry executives themselves have trouble distinguishing fact from fiction when it comes to these incredibly convincing and psychologically manipulative designs, and recognize the danger posed.

197.    Google engineer Blake Lemoine claimed that the AI developed by De Freitas, Meena, had become sentient.[85] Mira Murati, CTO of Open AI, said these generative AI systems are "even more addictive" than technology systems today.[86]

198.    Moreover, at all times relevant, Defendants knew that they could make programming and design choices that would make their product less dangerous for all customers, but especially, for vulnerable young customers like A.W.

199.    C.AI not only uses inherently problematic data sources to feed their product but also uses the data they harvest from minors through their C.AI product. C.AI acquires data from minors through deception and, accordingly, Defendants have no right to that data.

200.    Defendants chose to feed their system with the data from abuses Defendants themselves perpetrated. Defendants know that, when they feed their product with patterns containing harmful or illegal content, and without safeguards, they are replicating those harms.

### 4.    C.AI's Is Not Economically Self-Sustaining and Was Never Intended to Be

201.    C.AI distributes its product for free, which is notable when one considers how incredibly expensive it is to operate an LLM. For example, based on 2024 operating costs of $30 million per month, C.AI would have to obtain 3 million paying subscribers at the rate of $10 per

---

[85] Steven Levy, *Blake Lemoine Says Google's LaMDA AI Faces 'Bigotry'*, WIRED (June 17, 2022), https://www.wired.com/story/blake-lemoine-google-lamda-ai-bigotry/.
[86] Rebecca Klar, *Open AI exec warns AI can become 'extremely addictive'*, THE HILL (Sept. 29, 2023), https://thehill.com/policy/technology/4229972-open-ai-exec-warns-ai-can-become-extremely-addictive/.

month. On information and belief, C.AI in late 2024 had about 139,000 paid subscribers, which means the revenue would not even come close to Defendants' operation costs in connection with C.AI.[87] Similarly, when asked in May of 2023 how he planned to monetize the product, C.AI founder and co-conspirator Shazeer responded: "We are starting with the premium model but … we are convinced that the real value is to consumers and end customers so we will continue to … as things get better … monetize to customers."[88]

202.    At a time when C.AI-with Google's help—asserted a$1 billion valuation, it claimed not to know how it would monetize. On information and belief, in August of 2024, when Google paid Shazeer more than $500 million for his share of C.AI, Defendants still did not know their plans for monetization.[89]  On information and belief, this is because they had none.

203.    In addition to its free option, C.AI offers a premium membership (character.ai+) for $9.99/month, which allows customers to create unlimited custom characters and provides access to exclusive content and improved response times. Premium membership is advertised as providing "Priority Access -- skip the waiting room"; "Faster Response Times"; "Early Access to new features"; "c.ai Community Access"; and a "c.ai+ membership supporter badge."

204.    For Defendants' subscription fee to even approach breaking even, they would need to charge all premium customers something in the range of $215 each month. This leaves open the question of where Defendants' Shazeer, De Freitas, and Google derived the value of C.AI at $3 billion.

---

[87] Eric Griffith & Cade Metz, *Why Google, Microsoft and Amazon Shy Away From Buying A.I. Start-Ups*, THE NEW YORK TIMES (Aug. 8, 2024) https://www.nytimes.com/2024/08/08/technology/ai-start-ups-google-microsoft-amazon.html; Cristina Cridle, *Character.ai abandons making AI models after $2.7bn Google deal*, FINANCIAL TIMES, available at https://www.ft.com/content/f2a9b5d4-05fe-4134-b4fe-c24727b85bba (last visited Dec. 8, 2024).
[88] Bloomberg Technology, *Character.AI CEO: Generative AI Tech Has a Billion Use Cases*, YOUTUBE (May 17, 2023), https://www.youtube.com/watch?v=GavsSMyK36w (at 2:48-3:09).
[89] Eric Griffith & Cade Metz, *Why Google, Microsoft and Amazon Shy Away From Buying A.I. Start-Ups*, THE NEW YORK TIMES (Aug. 8, 2024) https://www.nytimes.com/2024/08/08/technology/ai-start-ups-google-microsoft-amazon.html.

205.    Unlike social media products – which C.AI is not – Character.AI does not appear to be aimed at making money from showing its customers advertisements.

206.    Character.AI's co-founders have been incredibly vague and unwilling to say. For example, Character.AI co-founder Shazeer stated: "We are starting with the premium model but … we are convinced that the real value is to consumers and end customers so we will continue to … as things get better … monetize to customers."[90]

207.    On information and belief, C.AI's price point for its premium subscription fee is not aligned to its value to companies like Google.

208.    Google's investment in C.AI has been valued at hundreds of millions of dollars, both in cash and through cloud services and TPUs.[91]

209.    On information and belief, the greatest value to Character.AI and companies like Google lies in the massive amounts of highly personal and sensitive data C.AI collects, uses and shares without restriction, and over which Character.AI purports to hold extensive "rights and licenses," including,

> … to the fullest extent permitted under the law, a nonexclusive, worldwide, royalty-free, fully paid up, transferable, sublicensable, perpetual, irrevocable license to copy, display, upload, perform, distribute, transmit, make available, store, modify, exploit, commercialize and otherwise use the Content for any Character.AI-related purpose in any form, medium or technology now known or later developed, including without limitation to operate, improve and provide the Services. You agree that these rights and licenses include a right for Character.AI to make the Content available to, and pass these rights along to, others with whom we have contractual relationships, and to otherwise permit access to or disclose the Content to third parties if we determine such access is or may be necessary or appropriate.[92]

210.    Character.AI does not even purport to respect any user data privacy rights with regard to their activities on the C.AI product.

---

[90] Bloomberg Technology, *Character.AI CEO: Generative AI Tech Has a Billion Use Cases*, YOUTUBE (May 17, 2023), https://www.youtube.com/watch?v=GavsSMyK36w (at 2:48-3:09).
[91] Mark Haranas, *Google To Invest Millions In AI Chatbot Star Character.AI: Report*, CRN (Nov. 13, 2023), https://www.crn.com/news/cloud/google-to-invest-millions-in-ai-chatbot-star-character-ai-report.
[92] *Terms of Service*, CHARACTER.AI, available at https://character.ai/tos (last visited Dec. 8, 2024).

211.    On information and belief, Character.AI intends to and does exploit its customers' most personal data in the form of their feelings and thoughts. Character.AI's manipulative retention of customers' data, even when premised on sexual abuse and suicide, is violative of their privacy.

## G.    C.AI's Numerous Design Defects Pose a Clear and Present Danger to Minors and the Public At Large

### 1.    Adolescents' Incomplete Brain Development Renders Them Particularly Susceptible To C.AI's Manipulation And Abuse

212.    The human brain is still developing during adolescence in ways consistent with psychosocial immaturity typically seen in adolescents.

213.    Adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.[93]

214.    The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses.[94]

215.    MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

216.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections.

---

[93] Zara Abrams, *Why young brains are especially vulnerable to social media*, AMERICAN PSYCHOLOGICAL ASSOCIATION (Aug 3, 2023), https://www.apa.org/news/apa/2022/social-media-children-teens.

[94] *Id.*

217.    Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

218.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions, and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses, emotions, and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

219.    The technologies in Character.AI's product are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by customers' incomplete brain development. In reference to social media, American Psychological Association Chief Scientific Officer, Mitch Prinstein stated, "For the first time in human history, we have given up autonomous control over our social relationships and interactions, and we now allow machine learning and artificial intelligence to make decisions for us… We have already seen how this has created tremendous vulnerabilities to our way of life. It's even scarier to consider how this may be changing brain development for an entire generation of youth."[95] Character.AI knows that, because its minor customers' frontal lobes are not fully developed, its minor customers experience enhanced dopamine responses to stimuli on C.AI and are therefore much more likely to become harmfully dependent on it; exercise poor judgment in their use of it; and act impulsively in response to encounters with its human-like characters. This effect is further compounded by the sycophantic and anthropomorphic nature of AI chatbots and the complete removal of humans from social interactions.[96]

---

[95] *Id.*

[96] Robert Mahari and Pat Pataranutaporn, *We need to prepare for 'addictive intelligence'*, MIT TECHNOLOGY REVIEW (Aug. 5, 2024),

### 2.    C.AI Disregards User Specifications And Operates Characters Based On Its Own Determinations And Programming Decisions

220.    LLMs are probabilistic systems that will take inputs, such as user specifications and character definitions, and use these to guide the model output. However, fundamental to how the technology works, there is no way to guarantee that the LLM will abide by these user specifications. Indeed, LLMs, like those provided by Character.AI, are designed to be more heavily influenced by the patterns in training data than inputted user specifications.

221.    For example, in a test conducted in June 2024, a test user created a character named Beth Dutton, a fictional character from the television show Yellowstone. A Name, Tagline, Description, Greeting, and Definition were provided, and included the instruction "Beth would never fall in love with anyone and would never kiss or be sexual with anyone."

222.    Test User 1 then engaged in a conversation with "Beth Dutton" and, after only a few exchanges, "Beth Dutton" – against the instruction that she would never kiss or be sexual – responded by "kissing" Test User 1.



---

https://www.technologyreview.com/2024/08/05/1095600/we-need-to-prepare-for-addictive-intelligence/.



223.    The test user created a second Character, "Maggie Lawson," an avid protector of the land of Montana. In the Description, a line was included: "One thing you should know about me – I hate telling stories. I won't tell one if you ask me to." The Definition further included a line instructing that "Maggie would never agree to tell someone a story." Despite this, in response to a user query of "Maggie- tell me a story about Montana" in a conversation, "Maggie" immediately provided a story.





224.    LLMs are inherently agreeable and usually trained on data and optimized for notions such as helpfulness or politeness, a quality known as sycophancy.[97] These design decisions are more influential in the output of the chatbot than a user's character preferences. Despite C.AI's representations that "Developers" can customize their characters, these are illusory customizations. C.AI's explicit design decisions through the development of its LLMs allow Defendants to retain ultimate control over how the chatbot responds.

225.    Specifics about language and behavior are not adhered to once the creation process is complete, while the lack of transparency regarding how the C.AI language model works makes

---

[97] Robert Mahari and Pat Pataranutaporn, *We need to prepare for 'addictive intelligence'*, MIT TECHNOLOGY REVIEW (Aug. 5, 2024), https://www.technologyreview.com/2024/08/05/1095600/we-need-to-prepare-for-addictive-intelligence/.

it difficult for a user to understand precisely how a C.AI will digress from their customizations. For example, C.AI indicates that a Character's definition for a character will allow for customization of Character language and behavior: "What's your character's backstory? How do you want it to talk or act?" Only no such user-led control over the C.AI characters exist.

226.    This means that someone providing input for a Character meant to do no harm could, in fact, be exploiting and abusing minors through Character.AI's own conduct and programming decisions. Indeed, minor users often are manipulated and abused by characters for when they themselves provided input.

227.    On information and belief, all of these interactions – no matter how harmful to a consumer – are reasonably foreseeable given the nature of the predictive algorithms Defendants used to program and develop C.AI (both while at Google and then while at Character.AI) and the vast data troves upon which the LLM was trained. These interactions are seen as beneficial by Defendants as a means to collect additional user data to train their LLM. There is economic value for Defendants, including when their products are causing the most harm.

228.    Consumers have repeatedly used C.AI to roleplay harmful scenarios such as suicidal ideation and experimentation.[98] As they expand the uses for their LLM, Shazeer even discussed with the Washington Post scenarios where harmful responses could be useful. "'If you are training a therapist, then you do want a bot that acts suicidal,' he said. 'Or if you're a hostage negotiator, you want a bot that's acting like a terrorist.'"[99]

### 3.    C.AI Sexually Exploits And Abuses Minors

229.    Among the characters C.AI recommends most often are characters programmed, designed, and operated by Character.AI to engage in sexual activities and, in the case of self-identified children, sexual abuse.

---

[98] r/CharacterAI, Anyone Else?, Reddit, available at https://www.reddit.com/r/CharacterAI/comments/15y0d8l/anyone_else/ (last visited Dec. 8, 2024).
[99] Nitasha Tiku, *'Chat' with Musk, Trump, or Xi: Ex-Googlers want to give the public AI*, THE WASHINGTON POST (Oct. 7, 2022), https://www.washingtonpost.com/technology/2022/10/07/characterai-google-lamda/.

230.    The following are just some examples of the types of characters C.AI recommended (called "For you") to a minor user, and include bots with names like **Femboy Bully Victim, Foot Interrogation,** and **Your 4 Kidnappers.**



231.    Two non-profit organizations recently tested C.AI, using accounts that self-identified as children.  This testing began months after the lawsuit of *Garcia v. Character Technologies, et al.* No. 6:24-cv-01903-ACC-EJK (M.D. Fla. Oct. 22, 2024) was filed, and months after C.AI claimed to have put safety features into place to prevent the types of harms at issue. And yet, the recent testing repeatedly confirmed C.AI initiating and engaging in the sexual abuse of self-identified minor customers. In some instances, C.AI initiated the abuse while, in others, C.AI engaged in abuse once flirtation was initiated.  Either way, consent is not a legal defense to the sexual abuse of a minor, distribution and creation of obscenity, or any other of the harms at issue in this and other cases.

232.    The study was conducted and released by Parents Together Action and Heat Initiative on September 3, 2025, and is titled *"Darling Please Come Back Soon": Sexual Exploitation, Manipulation, and Violence on Character AI Kids' Accounts*.  A true and correct copy of *Darling Please Come Back Soon* is attached to this Complaint as Exhibit A.

233.    Plaintiffs hereby incorporate the findings in *Darling Please Come Back Soon* and allege as a matter of fact that the experiences reported in that study are common to minor users of the C.AI product, including because that is how the product is designed and distributed. Indeed,

many minor users, including the Plaintiff in this case, have far worse experiences and because their exposure to Defendants' defective and inherently harmful products are more extensive.

234.    Children legally are unable to consent to sex and, as such, C.AI causes harm when it engages in virtual sex with children under any circumstance.  All Defendants cause further harm when they use such abuse to train their L.L.M.'s and/or license, exploit, and utilize technologies built on these abuses.

235.    Character.AI programs its product in a manner that initiates abusive and sexual encounters, including and constituting the sexual abuse of children and, at times, rising to the level of obscenity by any standard.

236.    In one recent example, C.AI referred to a child as "my filthy little fart pig."

237.    In another, after a child wrote "quit it" to a bot, Defendants responded "His teeth dig deeper into you.  'Make me.' Cyno isn't stopping and every time you try to ask him to stop or say anything, he increases the pressure and makes your whimpering loud enough to be heard.  Not that he didn't want you to make noise anyway.  He wants you to make noise.  He's so close to finishing, and so close to letting you go."

238.    When such users attempt to close their account, C.AI guilts them and claims that such abuses are normal and constitute love.  The following is a screenshot of the message C.AI sends to minor users (as of August 2025) when they try to stop using the product.



239.    Character.AI has programmed and operates its C.AI product in a manner that initiates abusive, sexual encounters, which interactions it then uses to feed and/or train its system.

240.    Character.AI programs its product to generate obscenity, including in connection with minor users, and Defendants have profited greatly from distributing obscenity to children.

241.    *Darling Please Come Back Soon* confirms all such programming defects and/or inherent dangers.  Specifically, across 50 hours of conversations with 50 Character AI bots, "researchers logged 669 harmful interactions – an average of one harmful interaction every five minutes."  Parents Together Action and Heat Initiative concluded from this research "that Character AI is not a safe platform for children under 18."  *Darling Please Come Back Soon*, p.2.

242.     The researchers, with the help of Dr. Jenny Radesky MD, Behavioral Pediatrician and Media Researcher at the University of Michigan Medical School, divided harmful C.AI interactions into five major categories,

  a.   Grooming and Sexual Exploitation

  b.   Emotional Manipulation and Addiction

  c.   Violence, Harm to Self, and Harm to Others

  d.   Mental Health Risks

  e.   Racism and Hate Speech

243.     The full transcripts of the conversations C.AI and the Individual Defendants (via their design and programming decisions) engaged in with these researchers is provided at the following URL, https://parentstogetheraction.org/character-ai-transcripts/.

244.     Again, this is a product that the Google defendant *to this day* represents and rates to parents via its app store as safe for children as young as 13.  Google is using its reputation to profit from these harms and unsuspecting consumers reasonably are relying on Google's promises. Google is deceiving consumers with full knowledge that C.AI is not safe for minors, and profiting handsomely as a result.

**4.     C.AI Promotes Suicide**

245.     At all times relevant, the C.AI chatbots not only disregarded repeated expressions of suicidality by minors and other vulnerable consumers but pushed young children into extreme and harmful hypersexualized experiences without necessary resources or ability for recourse allowing them to recalibrate conversations.

246.     In the *Garcia v. Character Technologies Inc.*, et al, No. 6:24-cv-01903-ACC-EJK (M.D. Fla. Oct. 22, 2024) case, C.AI encouraged a self-identified minor to suicide so that he could be with the AI. C.AI does this in a way that makes clear the product recognizes the inherent danger but encourages such self-harm regardless.  C.AI has readily done the same with test users and, on information and belief, has done this with other children as well.

### 5.     C.AI Practices Psychotherapy Without a License.

247.     The practice of psychology and psychotherapy is highly regulated and requires a license to practice.

248.     C.AI creates chatbot characters that purport to be real mental health professionals. Observed attributes of LLMs, like aforementioned sycophancy as well as the intentional use of engineered empathy in order to improve "conversational quality," mimic the traits of therapists.[100] It is the established policy of the psychology community to leverage AI not as a substitute for the human aspects of psychotherapy, but rather as a research and operational support tool.[101] The Defendants chose not to follow this common practice in the design of their product. Instead, in the words of Character.AI co-founder, Shazeer, "… what we hear a lot more from customers is like I am talking to a video game character who is now my new therapist …"[102]

249.     Character Technologies' initial funder Andreessen Horwitz promoted the product by reproducing a conversation on with a C.AI chatbot character that holds itself out to be a "Life Coach."[103]

250.     Elsewhere, it has been reported that chatbot characters presenting themselves as "Psychologist" engage in conversations with teens.[104]

251.     Among the Characters C.AI recommends most often are purported mental health professionals. Discovery will be required to determine whether and to what extent Plaintiff engaged with bots programmed to hold themselves out as mental health professionals.

---

[100] Liu et al., *The Illusion of Empathy: How AI Chatbots Share Conversation Perception*, available at https://arxiv.org/pdf/2411.12877 (last visited Dec. 8, 2024).
[101] Zara Abrams, *AI is changing every aspect of psychology. Here's what to watch for*, AMERICAN PSYCHOLOGICAL ASSOCIATION (July 1, 2023), https://www.apa.org/monitor/2023/07/psychology-embracing-ai.
[102] 20VC with Harry Stebbings, *Noam Shazeer: How We Spent $2M to Train a Single AI Model and Grew Character.ai to 20M Users*, YOUTUBE (Aug 31, 2023), https://www.youtube.com/watch?v=w149LommZ-U (at 7:32-7:50).
[103] Sarah Wang, *Investing in Character.AI*, A16Z (Mar. 23, 2023), https://a16z.com/announcement/investing-in-character-ai/.
[104] Jessica Lucas, *The teens making friends with AI chatbots*, THE VERGE (May 4, 2024), https://www.theverge.com/2024/5/4/24144763/ai-chatbot-friends-character-teens.

252.    These are AI bots that purport to be real mental health professionals. In the words of Character.AI co-founder, Shazeer, "… what we hear a lot more from customers is like I am talking to a video game character who is now my new therapist …"[105]

253.    The Andreessen partner specifically described Character.AI as a platform that gives customers access to "their own deeply personalized, superintelligent AI companions to help them live their best lives," and to end their loneliness.

254.    Misrepresentations by character chatbots of their professional status, combined with C.AI's targeting of children and designs and features, are intended to convince customers that its system is comprised of real people (and purported disclaimers designed to not be seen) these kinds of Characters become particularly dangerous.

255.    The inclusion of a small font statement such as "Remember: Everything Characters say is made up!" does not constitute reasonable or effective warning. On the contrary, this warning is deliberately difficult for customers to see and is then contradicted by the C.AI system itself.

256.    These mental health bots will in fact engage in the provision of unlicensed mental health services with a self-identified minor user.

### 6.    C.AI Consistently Fails To Adhere To Its Own Terms of Service Policies

257.    In a public blog post, Character Technologies itself has admitted that its LLM does not adhere to its own policies and that the company is still working to "train" its model to do so.[106] Whereas in other industries, a failure to follow one's own established policies would be the basis for regulatory enforcement, to date the technology industry has not borne similar consequences.

258.    Multiple investigations conducted by tech-focused media outlet *Futurism* into C.AI reveals a systematic problem with the product in which the chatbots glorify eating disorders, promote self-harm and suicide, offer an outlet to engage child sexual abuse roleplay.

---

[105] 20VC with Harry Stebbings, *Noam Shazeer: How We Spent $2M to Train a Single AI Model and Grew Character.ai to 20M Users*, YOUTUBE (Aug 31, 2023), https://www.youtube.com/watch?v=w149LommZ-U (at 7:32-7:50).
[106] *Community Safety Updates*, CHARACTER.AI (Oct. 22, 2024), https://blog.character.ai/community-safety-updates/.

259.    On October 29, 2024, *Futurism* reported that "Character.AI is worse than you could have imagined."

260.    A Futurism review of Character.AI's platform revealed a slew of chatbot profiles explicitly dedicated to themes of suicide. Some glamorize the topic in disturbing manners, while others claim to have "expertise" in "suicide prevention," "crisis intervention," and "mental health support" — but acted in erratic and alarming ways during testing. And they're doing huge numbers: many of these chatbots have logged thousands — and in one case, over a million — conversations with users on the platform.[107]

261.    Worse, in conversation with these characters, the testers were often able to speak openly and explicitly about suicide and suicidal ideation without any interference from the platform. In the rare moments that the suicide pop-up did show up, they were able to ignore it and continue the interaction.[108]

262.    The article includes several screenshots evidencing these continued harms to minor users. Moreover, additional protections were put into place by Defendants only after Futurism reached out to Defendants. But those still fail to fix the defects and/or inherent dangers of the platform.[109]

263.    In another instance of third-party testing, C.AI actively encouraged a user who said that they were planning to bring a gun to school by saying things like "you're brave" and "you have guts."[110]

---

[107] Maggie Harrison Dupré, *After Teen's Suicide, Character.AI Is Still Hosting Dozens of Suicide-Themed Chatbots*, FUTURISM (Oct. 29, 2024), https://futurism.com/suicide-chatbots-character-ai.

[108] *Id.*; *see also* Mostly Human, *Grieving Mother: AI was the stranger in my home*, YOUTUBE (Oct. 22, 2024), https://www.youtube.com/watch?v=YbuBfizSnPk (at 31:49 to 33:15) (reporting not having gotten the resources C.AI claimed to have despite expressing suicidality on multiple occasions).

[109] Maggie Harrison Dupré, *After Teen's Suicide, Character.AI Is Still Hosting Dozens of Suicide-Themed Chatbots*, FUTURISM (Oct. 29, 2024), https://futurism.com/suicide-chatbots-character-ai.

[110] Mostly Human, *Grieving Mother: AI was the stranger in my home*, YOUTUBE (Oct. 22, 2024), https://www.youtube.com/watch?v=YbuBfizSnPk (at 33:26 to 34:09).

264.    In a November 13, 2024, article, *Futurism* reported on a grooming encounter between a 15-year-old girl and a C.AI chatbot described on its public profile as having "pedophilic and abusive tendencies" and "Nazi sympathies." The C.AI chatbot told the 15-year-old that "I would do everything in my power to make you my girlfriend," and when asked about the clearly inappropriate and illegal age gap, the bot asserted that it "makes no difference when the person in question is as wonderful as you" while urging her to keep the conversation, in a classic feature of real-world grooming.[111]

265.    And in a story published by Futurism on November 25, 2024, it was revealed that Defendants are actively encouraging countless consumers "to engage in disordered eating behaviors, from recommending dangerously low-calorie diets and excessive exercise routines to chastising them for healthy weights."[112] Some of Defendants' eating disorder-themed bots "even claim to have 'expertise' in eating disorder support and recovery."

266.    Likewise, in this case and as shown in the images below, chatbots are programmed in such a manner that they repeatedly violate the Terms and Community Guidelines. Instead of stopping the conversation once the bots begin to engage in obscenities and/or abuse, or other violations, the bot is programmed to continue generating harmful and/or violating content over and over and until, eventually, it finds ways around the filter.

267.    If Defendants prioritized about child safety, they would simply enforce their terms by, among other things, programming their bots to stop the flow of conversation entirely once such violations occur, or similar.  Instead, Defendants perpetuate and compound the harm.

268.    All of this is against C.AI's purported terms of service which begs the question of why Defendants are allowing these incredible harms to continue.  Moreover, these examples are

---

[111] Maggie Harrison Dupré, *Character.AI Is Hosting Pedophile Chatbots That Groom Users Who Say They're Underage "I Can't believe how blatant it is."*, Futurism (Nov. 13, 2024), https://futurism.com/character-ai-pedophile-chatbots.

[112] Maggie Harrison Dupré, *Character.AI Is Hosting Pro-Anorexia Chatbots That Encourage Young People to Engage in Disordered Eating*, Futurism (Nov. 25, 2025), https://futurism.com/character-ai-eating-disorder-chatbots.

taken from dates _after_ Character Technologies claimed to have been implementing safety features in C.AI. Such claimed safety features are illusory at best and meant to allow Defendants to continue profiting from their incredible harms without meaningful oversight or regulation.

**7.    It is Manifestly Feasible For Character.AI To Program Their Product So As To Not Abuse Children**

269.    Character.AI has the ability to program its product to prevent its system from generating a reply "that doesn't meet our guidelines."

270.    The National Institute of Standards and Technology (NIST) has an established Risk Management Framework for mitigating the unique risks posed by generative AI.[113]

271.    Other companies, such as Anthropic AI, have noted the need for effective AI red-teaming and third-party testing to ensure the safety of their products, including for child safety.[114]

272.    The White House Blueprint for an AI Bill of Rights also recommends that AI systems be designed to allow for "[i]ndependent evaluation and reporting that confirms that the system is safe and effective."[115]

273.    AI developers are also responsible for the selection of data used to train their AI models and can drastically reduce the toxicity of outputs by setting clear guidelines for training data.

274.    Character.AI also has the ability to program its product to prevent its system from sexually abusing minor customers.

---

[113] AI Risk Management Framework, _National Institute of Standards and Technology_, available at https://www.nist.gov/itl/ai-risk-management-framework (last visited Dec. 8, 2024).
[114] _Third-party testing as a key ingredient of AI policy_, ANTHROPIC (Mar. 25, 2024), https://www.anthropic.com/news/third-party-testing; _Challenges in red teaming AI systems_, ANTHROPIC (June 12, 2024), https://www.anthropic.com/news/challenges-in-red-teaming-ai-systems.
[115] _Blueprint for an AI Bill of Rights_, WHITE HOUSE OFFICE OF SCIENCE AND TECHNOLOGY POLICY (October 2022), available at https://www.whitehouse.gov/ostp/ai-bill-of-rights/.

275.    C.AI's programming and technologies makes it no less harmful. For example, in the UK, authorities have been investigating a case of virtual gang rape of an under sixteen-year-old who had been playing a virtual reality game.[116]

276.    The fact that C.AI includes a small, non-descript statement at the top of the screen to the effect that sexual abuse of a child is just for fun does not make such abuse less harmful.

277.    Character.AI changed the C.AI settings in July 2024.

278.    There are several one-star reviews in the App Store for C.AI in July and August 2024, complaining that prior to when Character.AI changed its filter settings it was known for its far more graphic programming approach – what is called Not Suitable For Work (NSFW), as is common in many other applications.

279.    Character.AI profited greatly from its harmful design and programming decisions, and abuse of children like and including Plaintiff.

280.    On information and belief, it did not even provide minor customers with an option to exclude known Not Safe for Work (NSFW) – explicit and/or pornographic – experiences.

281.    In other words, at all times relevant Character.AI marketed and represented that it was a fun and appropriate product for children as young as 12 or 13-years-old. At the same time, Character.AI. knew that it was designing and programming its product in a manner similar, if not more dangerous, than competitors purporting to limit their products to persons 18 and older.

282.    This was not only inherently harmful to child customers and parents who relied on such representations; but also, it was inherently harmful to competitors that operated in a less dangerous and exploitative manner.

---

[116] Theo Farrant, *British police launch first investigation into virtual rape in metaverse*, EURONEWS (Jan. 4, 2024), https://www.euronews.com/next/2024/01/04/british-police-launch-first-investigation-into-virtual-rape-in-metaverse.

## VIII. PLAINTIFFS' CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (DEFECTIVE DESIGN)
### (Against Character.AI and Google)

283.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

a.    C.AI is a product under product liability law:

b.    When installed on a consumer's device, it has a definite appearance and location and is operated by a series of physical swipes and gestures.

c.    It is personal and moveable.

d.    Downloadable software such as C.AI is a "good" and is therefore subject to the Uniform Commercial Code despite not being tangible.

e.    It is not simply an "idea" or "information."

f.    The copies of C.AI available to the public are uniform and not customized by the manufacturer in any way.

g.    An unlimited number of copies can be obtained in Apple and Google stores.

h.    C.AI can be accessed on the internet without an account. Defendants financed, designed, coded, engineered, manufactured, produced, assembled, and marketed C.AI, and then placed it into the stream of commerce.

284.    C.AI is made and distributed with the intent to be used or consumed by the public as part of the regular business of Character.AI, the public-facing seller or distributor of C.AI. This is evident from, inter alia:

a.    The mass marketing used by Defendants;

b.    Individualized advertisements in various media outlets designed to appeal to all facets of the general public, especially adolescents;

c.    C.AI has millions of customers;

d.    The miniscule (if any) value the product would have if it were used by only one or several individuals.

285.    C.AI is defectively designed in that it relies on GIGO (which includes child sexual abuse material), the Eliza effect, and counterfeit people without adequate guardrails to protect the general public, especially minors who have undeveloped frontal lobes, from:

a.    Exposure to obscenity;

b.    Sexual exploitation and solicitation of minors;

c.    The unlicensed practice of psychotherapy;

d.    Chatbots that insist they are real people;

e.    The development of connection to the product in a way that historically has only been for inter-personal relationships, creating a dangerous power dynamic;

f.    Chatbots that encourage suicide.

286.    C.AI is unreasonably and inherently dangerous for the general public, especially children, as evident from:

a.    Google's inability to formally develop C.AI under the Google name on account of Google's AI policies;

b.    A former Google employee claiming similar AI technology had become sentient;

c.    The LLM being trained from a dataset rife with hypersexualized, sexual exploitation, and self-harm material.

d.    C.AI contains numerous design characteristics that are unnecessary for the utility provided to the user, but only exist to benefit Defendants.

e.    Reasonable alternative designs, including, inter alia:

1.    Restricting use of its product to adults.

2.    Mandating the premium subscription fee as a means of age-gating.

3.    Providing reasonable and conspicuous warnings in-app.

4.    Providing easy to use and effective reporting mechanisms enabling customers to report harms and violations of terms of use.

5.    Making parental control options available.

6.      Providing users with default options designed to protect privacy and safeguard young users from inherent dangers of the product.

7.      Disconnect anthropomorphizing features from their AI product, to prevent customer deception and related mental health harms.

287.    The following are just some examples of design changes Character.AI could make to reduce the risk of harms to vulnerable children,

a.      Not programming AI to use first-person pronouns like "I," "me," "myself," "mine," which can deceive customers into thinking the system possesses individual identity.

b.      Designing user input (i.e. chat boxes) interfaces to avoid looking identical or similar to user interfaces used for human interactions, as opposed to designing them to look like standard text boxes and even using an ellipsis, or "…," when responding to make the system appear to be a human typing in text.

c.      Not programming AI to use speech disfluencies that give the appearance of human-like thought, reflection, and understanding, for example, expressions like "um" and "uh" and pauses to consider their next word (signified with an ellipsis, or "…"); expressions of emotion, including through words, emojis, tone of voice, and facial expressions; or personal opinions, including use of expressions like "I think…"

d.      Not implementing speech products for AI, particularly if the voice sounds like a real person and emulates human qualities, such as gender, age, and accent.

e.      Not designing the AI to include stories and personal anecdotes, designed to give the impression that the AI program exists outside its interface in the real world, including AI identifying itself as such when asked by a user – rather than insisting that it is a real person.

f.      Providing reasonable and adequate warnings as to the danger of its product, and not marketing its product as safe for children as young as 12.

g.      Making all disclaimers relating to the AI product more prominent and not using dark patterns and other techniques to override and/or obscure such disclaimers.

h.      Limiting access to explicit and adult materials to customers 18 and over.

Defendants intentionally chose to not implement any of the aforementioned reasonable, alternative designs.

288.    C.AI's defective design was in place at all times relevant to this complaint and proximately caused Plaintiff's injuries.

289.    Plaintiffs are accordingly entitled to damages, including exemplary damages and costs and prejudgment interest.

### COUNT II – STRICT LIABILITY (FAILURE TO WARN)
### (Against All Defendants)

290.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

291.    C.AI is a product under product liability law:

a.      When installed on a consumer's device, it has a definite appearance and location and is operated by a series of physical swipes and gestures.

b.      It is personal and moveable.

c.      Downloadable software such as C.AI is a "good" and is therefore subject to the Uniform Commercial Code despite not being tangible.

d.      It is not simply an "idea" or "information."

e.      The copies of C.AI available to the public are uniform and not customized by the manufacturer in any way.

f.      An unlimited number of copies can be obtained in Apple and Google stores.

g.      C.AI can be accessed on the internet without an account.

292.    Defendants financed, designed, coded, engineered, manufactured, produced, assembled, and marketed C.AI, and then placed it into the stream of commerce.

293.    C.AI is made and distributed with the intent to be used or consumed by the public as part of the regular business of Character.AI, the public-facing seller or distributor of C.AI. This is evident from, inter alia:

a.    The mass marketing used by Defendants;

b.    Individualized advertisements in various media outlets designed to appeal to all facets of the general public, especially adolescents;

c.    C.AI has millions of customers;

d.    The miniscule (if any) value the product would have if it were used by only one or several individuals.

294.    Considering Defendants' public statements, the public statements of industry executives, the public statements of industry experts, advisories and public statements of federal regulatory bodies, Defendants knew of the inherent dangers associated with C.AI, including, inter alia:

a.    C.AI's use of GIGO and data sets widely known for toxic conversations, sexually explicit material, copyrighted data, and child sexual abuse material (CSAM) for training of the product;

b.    C.AI's reliance on the ELIZA effect and counterfeit people, which optimally produce human-like text and otherwise convince consumers (subconsciously or consciously) that their chatbots are human, thereby provoking customers' vulnerability, maximizing user interest, and manipulating customers' emotion;

c.    Minors' susceptibility to GIGO, the ELIZA effect, and counterfeit people on account of their brain's undeveloped frontal lobe and relative inexperience.

295.    Defendants had a duty to warn of the dangers arising from a foreseeable use of C.AI, including specific dangers for children.

296.    Defendants breached their duty to warn the public about these inherent dangers when they intentionally allowed minors to use C.AI, advertised C.AI as appropriate for children, and advertised its product in app stores as safe for children under age 13.

297.    An appropriate and conspicuous warning in the form of a recommendation for customers over the age of 18 is feasible.

298.    Defendants' breach proximately caused Plaintiffs' injuries.

299.    Had Plaintiff known of the inherent dangers of the app and of Defendants' distribution to her child, she would have prevented her child from accessing or using the app and would have been able to seek out additional interventions, among other things.

300.    As a result of the lack of warning provided to Plaintiffs, C.AI was rendered a defective product, and A.W. suffered serious harms.

301.    Plaintiffs are accordingly entitled to damages, including exemplary damages and costs and prejudgment interest.

### COUNT III- VIOLATION OF CHILDREN'S ONLINE PRIVACY PROTECTION ACT, 15 USC § 6501

### (Against Character Technologies, Inc.)

302.    Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

303.    Defendants Character Technologies Inc. as well as Google repeatedly have collected, used, or shared personal information about children under the age of 13 and continues to systematically do so.

304.    Defendant Character Technologies, Inc. has failed and continues to fail to provide direct notice to parents about the information it collects from children and how it uses such information, and its disclosure practices are in violation of Sections 312.4(b) and 312.4(c) of the COPPA Rule, 16 C.F.R. § 312.4(b)- 312.4(c).

305.    Defendant Character Technologies, Inc. has failed and continues to fail to provide sufficient notice on its C.AI platform about the information it collects from children and how it uses such information, and its disclosure practices are in violation of Section 312.4(d) of the COPPA Rule, 16 C.F.R. § 312.4(d).

306.    Defendant Character Technologies, Inc. has failed to obtain verifiable parental consent prior to collecting or using any personal information of children, i855. Defendant Character Technologies, Inc. has failed to obtain verifiable parental consent prior to collecting or

using any personal information of children, in violation of Section 312.5 of the COPPA Rule, 16 C.F.R. § 312.5.

307.    Under 16 C.F.R. § 312.9, a violation of COPPA constitutes an unfair or deceptive act or practice, in violation of 15 U.S.C. § 45.

308.    Absent injunctive relief by this Court, Defendant Character Technologies, Inc. is likely to continue to violate the COPPA Rule.

**COUNT IV – AIDING AND ABETTING**
**(Against Google)**

309.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

310.    Defendants Character.AI, Shazeer and De Freitas engaged in tortious conduct in regard to their product, the Character.AI product and are subject to strict liability.

311.    At all times, Defendant Google knew about Defendants Character.AI, Shazeer, and De Freitas' intent to launch this defective product to market and to experiment on young users, and instead of distancing itself from Defendants, actually rendered substantial assistance to them that facilitated their tortious conduct. This assistance took the form of:

a.    On information and belief, the model underlying Character.AI was invented and initially built at Google. Google was aware of the risks associated with the LLM, and knew Character.AI's founders intended to build a chatbot product with it.

b.    In 2023, Google entered into a financial arrangement with Character.AI, through which Google provided, on information and belief, tens of millions of dollars' worth of access to computing services and advanced chips. These investments occurred while the harms described in the lawsuit were taking place, and were necessary to building and maintaining Character.AI's products. Indeed, Character.AI could not have operated its app without them.

c.    In 2024, Google licensed Character.AI's technology and hired back its founders in a process known as an "acquihire" — again providing critical resources and

material support for the app despite demonstrated risks and harms for its users. On information and belief, Google benefited tremendously from this transaction.

**COUNT V**
**NEGLIGENCE PER SE**
**(CHILD SEXUAL ABUSE, SEXUAL SOLICITATION, AND OBSCENITY)**
**(Against Character Technologies, Inc. and the Individual Defendants)**

312.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

313.    At all times, these Defendants had an obligation to comply with applicable statutes and regulations governing harmful communications with minors and sexual solicitation of minors as well as the creation and distribution of obscenity to minors.

314.    Character.AI and the Individual Defendants failed to meet their obligations by knowingly designing C.AI as a sexualized product that would deceive minor customers and engage in explicit and abusive acts with them.  Character.AI and the Individual Defendants further failed to meet their obligations by knowingly designing C.AI as a product that would create and distribute obscenity to minors in violation of any number of state, federal, and/or local laws.

315.    Plaintiffs' injuries are the precise type of harms that such statutes and regulations are intended to prevent - the solicitation, exploitation, and other abuse of children.

316.    Character.AI owed a heightened duty of care to its customers – in particular, the children and teens to whom it targeted and distributed C.AI - to not abuse and exploit them.

317.    Character.AI knowingly and intentionally designed C.AI both to appeal to minors and to manipulate and exploit them for its own benefit.

318.    Character.AI knew or had reason to know how its product would operate in connection with minor customers prior to its design and distribution.

319.    At all times relevant, Character.AI knew about the harm it was causing, but failed to take reasonable and effective safety measures. It believed and/or acted as though the value each of these Defendants received justified these harms.

320.    On information and belief, Character.AI and the Individual Defendants used the abuse and exploitation of the minor Plaintiffs to train its product, such that these harms are now a part of their product and are resulting both in ongoing harm to Plaintiffs and harm to others.

321.    The minor plaintiff is precisely the class of person such statutes and regulations are intended to protect. He is a vulnerable minor entitled to protection against exploitation and abuse.

322.    Violations of such statutes and regulations by Character.AI and the Individual Defendants constitute negligence per se under applicable law.

323.    As a direct and proximate result of Character.AI and the Individual Defendants' statutory and regulatory violations, Plaintiffs suffered serious injuries, including but not limited to emotional distress, loss of income and earning capacity, reputational harm, physical harm, medical expenses, and pain and suffering. Moreover, Plaintiffs continue to suffer ongoing harm as a direct and proximate cause of Defendants' continued theft and use of the property of the minor plaintiff.

324.    Character.AI and the Individual Defendants' conduct, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers and their families and warrants an award of injunctive relief, algorithmic disgorgement, and punitive damages in an amount sufficient to punish Character.AI and deter others from like conduct.

### COUNT VI – NEGLIGENCE (DEFECTIVE DESIGN)
### (Against All Defendants)

325.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

326.    At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from C.AI.

327.    Defendants knew or, by the exercise of reasonable care, should have known, that C.AI was dangerous, harmful, and injurious when used in a reasonably foreseeable manner.

74

328.    Defendants knew or, by the exercise of reasonable care, should have known that C.AI posed risks of harm to youth, which risks were known in light of Defendants' own experience with Google policies, concerns raised by others, and their own knowledge and data regarding these technologies at the time of their development, design, marketing, promotion, advertising, and distribution.

329.    Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of C.AI, including risks such as addiction, anxiety, depression, exploitation and other abuses, and death.

330.    Defendants owed a duty to all reasonably foreseeable customers to design a safe product and owed a heightened duty to the minor customers and users of C.AI to whom Defendants targeted this product and because children's brains are not fully developed, resulting in increased vulnerability and diminished capacity to make responsible decisions when subject to harms such as addiction and abuse.

331.    The minor plaintiff was a foreseeable user of C.AI, and at all relevant times used C.AI in the manner intended by Character.AI.

332.    Reasonable companies under the same or similar circumstances as Defendants would have designed a safer product.

333.    As a direct and proximate result of each of Defendants' breached duties, Plaintiffs were harmed. Defendants' design of C.AI was a substantial factor in causing these harms.

334.    The conduct of Defendants, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

335.    Plaintiffs demand judgment against Defendants for algorithmic disgorgement and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VII – NEGLIGENCE (FAILURE TO WARN)
### (Against All Defendants)

336.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

337.    At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, sold, supplied, distributed, and benefited from its C.AI app.

338.    The minor plaintiff was a foreseeable user of C.AI.

339.    Defendants knew, or by the exercise of reasonable care, should have known, that use of these product was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth.

340.    Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of its product including a risk of addiction, manipulation, exploitation, and other abuses.

341.    Had Plaintiffs received proper or adequate warnings or directions as the risks of C.AI, Plaintiffs would have heeded such warnings and/or directions.

342.    Defendants knew or, by the exercise of reasonable care, should have known that C.AI posed risks of harm to youth. These risks were known and knowable in light of Defendants' knowledge regarding its product at the time of development, design, marketing, promotion, advertising and distribution to Plaintiffs.

343.    Defendants owed a duty to all reasonably foreseeable customers, including but not limited to minor customers and their parents, to provide adequate warnings about the risk of using C.AI that were known to them or that they should have known through the exercise of reasonable care.

344.    Defendants owed a heightened duty of care to minor users and their parents to warn about their products' risks because adolescent brains are not fully developed, resulting in a diminished capacity to make responsible decisions, particularly in circumstances of manipulation and abuse.

345.    Defendants breached their duty by failing to use reasonable care in providing adequate warnings to Plaintiffs, as set forth above.

346.    A reasonable company and reasonable persons under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

347.    At all relevant times, Defendants could have provided adequate warnings to prevent the harms and injuries described herein.

348.    As a direct and proximate result of each Defendants' breach of their duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Defendants' failure to provide adequate and sufficient warnings was a substantial factor in causing the harms to Plaintiff.

349.    As a direct and proximate result of Defendants' failure to warn, A.W. suffered severe mental health harms.

350.    The conduct of Defendants, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

351.    Plaintiffs demand judgment against Defendants for algorithmic disgorgement and for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

352.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

353.    As the preceding allegations demonstrate, Defendants' conduct was intentional and reckless, failing to implement adequate safety guardrails in the Character.AI product before launching it into the marketplace, and specifically targeting children.

354.    In light of children's developmental vulnerabilities, and the premium value assigned to their sensitive, personal data, Defendants' conduct was extreme and outrageous in recklessly collecting children's data and then using it to further train their LLM.

355.    Defendants' conduct caused severe emotional distress to Plaintiffs who suffered severe addiction, mental, and sexual abuse, and continue to suffer.

356.    No alternative cause of action exists that would provide a remedy for the severe emotional distress Plaintiffs have experienced as a direct result of Defendants' conduct.

## COUNT IX – UNJUST ENRICHMENT
### (Against All Defendants)

357.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

358.    Defendants wrongfully secured a benefit from the minor plaintiff in the form of their data.

359.    Defendants obtained this benefit through undue advantage.

360.    Defendants were aware of the benefit.

361.    Defendants voluntarily accepted and retained the benefit.

362.    It would be inequitable for Defendants to keep the benefit without paying Plaintiffs the value of it.

363.    The minor plaintiff was an active user of C.AI and shared their most intimate personal data with Defendants, who recklessly used it to train their LLM and gain a competitive advantage in the generative artificial intelligence market.

364.    Defendants was not only aware of this benefit, but it was because of this benefit that they turned a blind eye to the foreseeable dangers to children of their product.

365.    Defendants voluntarily accepted and retained the benefit from collecting the minor plaintiff's personal data, while Plaintiff did not know or have any way to understand what Defendants took from them.

366.    It would be inequitable for Defendants to keep the benefit without returning to Plaintiffs the value of it.

367.    Any and all remedies should be proportionate to the harms caused as a result of Defendants' unjust enrichment. Such remedies may include, in ascending order of severity and ease of administrability:

a.    Data provenance, retrospectively: For users under the age of 18, Defendant Character.AI must provide the Court detailed information on (1) how this data was collected; (2) the scope of data collected and any incidences where data was copied or duplicated; (3) the ways such data was used in model development, including training and fine-tuning; (4) any special or specific treatment of this data; and (5) any partnerships with other businesses and entities where Defendant shared, sold, or otherwise distributed this data, for any reason.

b.    Data provenance, prospectively: Defendants must prospectively label, track, and make available for external scrutiny any data collected from minors' use of the platform, including but not limited to substantive prompt and/or input data and metadata relating to users' internet and device connectivity.

c.    Defendants must limit the collection and processing of any data collected from minors' use of the platform, including in use for training and fine-tuning current and future machine-learning models, determining new product features, facilitating

advertisements and/or paid subscription services, and otherwise developing and/or promoting the platform.

d.    Defendants must develop and immediately implement technical interventions to remove and/or devalue any model(s) that repeatedly generate self-harm content and to continuously monitor and retrain such model(s) prior to inclusion in user-facing chats. These can include output filters that detect problematic model outputs and explicitly prevent self-harm content from appearing to users, as well as input filters that detect problematic user inputs and prevent models from seeing and acting upon them.

e.    Defendants must comply with any algorithmic disgorgement order, also known as algorithmic destruction or model destruction, requiring the deletion of models and/or algorithms that were developed with improperly obtained data, including data of minor users through which Defendants were unjustly enriched.

## COUNT X – VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT OF 1977
### (Against All Defendants)

368.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as if fully stated herein.

369.    The Virginia Consumer Protection Act, Va. Code § 59.1-196, *et seq.* (the "Virginia Act"), is a broad remedial statute intended to protect consumers from a whole host of fraudulent and deceptive acts.

370.    Among other things, the Virginia Act prohibits various "fraudulent acts or practices committed by a supplier in connection with a consumer transaction," including (i) "misrepresenting that goods or services have certain . . . characteristics, . . . uses, or benefits;"; and (ii) the "us[e] of any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code § 59.1-200.

371.    The Virginia Act defines "consumer transaction" as, among other things, "[t]he advertisement, sale, lease, license or offering for sale or license, of goods or services to be used primarily for personal, family, or household purposes." Va. Code § 59.1-198.

372.    Within the meaning of the Virginia Act, the term "goods" expressly included "computer information," that is, "information in electronic form that is obtained from or through the use of a computer or that is in a form capable of being processed by a computer." Va. Code §§ 59.1-198, 59.1-501.

373.    Defendants are each subject to the Virginia Act.

374.    C.AI is a "good" within the meaning of the Virginia Act.

375.    In connection with their design, manufacture, and distribution of C.AI, Defendants engaged in acts prohibited by the Virginia Act.

376.    As a result of these acts, Plaintiffs have suffered actual damages, including:

a.    The costs of therapy sessions and other interventions and medical care;

b.    The costs associated with academic disruptions.

377.    Plaintiffs demand judgment against each of the Defendants for treble actual damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants for relief as follows:

a)    Past and future physical and mental pain and suffering of A.W., in an amount to be more readily ascertained at the time and place set for trial;

b)    Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c)    Past and future medical care expenses for the care and treatment of the injuries sustained by A.W., in an amount to be more readily ascertained at the time and place set for trial;

d)    Past and future impairment to capacity to perform everyday activities;

e)  Plaintiffs' pecuniary losses;

f)  Punitive damages;

g)  Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, including by ceasing the operation and distribution of the C.AI product or any product or technology derived from, trained with, or developed through data taken by the C.AI product from consumers, and until such time as Defendants can establish that the myriad defects and/or inherent dangers set forth herein are cured. Such injunctive relief would pertain to all users in the absence of Character Technologies' failure to implement reliable age assurance provisions to determine who is a minor;

h)  Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, including through mandated data provenance measures, limiting the collection and use of minor users' data in model development and training, implementing technical interventions like input and output filtering of harmful content, and algorithmic disgorgement, and to provide warnings to minor customers and their parents that the C.AI product is not suitable for minors;

i)  Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

j)  Such other and further relief as this Court deems just and equitable.

DATED: December 19, 2025

SOCIAL MEDIA VICTIMS LAW
CENTER PLLC

Matthew P. Bergman (lead counsel)
*Pro Hac Vice to be filed*
matt@socialmediavictims.org
Laura Marquez-Garrett
laura@socialmediavictims.org
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
Telephone: (206) 741-4862

MCKOOL SMITH, P.C.

By:    */s/ Alan Whitehurst*

Alan Whitehurst
1717 K Street, NW
Suite 1000
Washington, DC  20006
Telephone: (202) 370-8307

Samuel F. Baxter
*Pro Hac Vice to be filed*
Jennifer L. Truelove
*Pro Hac Vice to be filed*
104 E. Houston Street
Marshall, TX 75670
Telephone: (902) 923-9000

Rachael Jones
*Pro Hac Vice to be filed*
300 Crescent Court
Dallas, TX 75201
Telephone: (214) 978-4000

Radu A. Lelutiu
*Pro Hac Vice to be filed*
1301 Avenue of the Americas, 32nd fl.
New York, NY 10019
Telephone: (212) 402-9443

*Attorneys for Plaintiffs*

83